[Civ. No. 14118. First Dist., Div. One. Aug. 28, 1950.]

SIDNEY ROY GARFIELD, Respondent, v. THE BOARD OF MEDICAL EXAMINERS et al., Appellants.

Fred N. Howser, Attorney General, and J. Albert Hutchinson, Deputy Attorney General, for Appellants.

William A. O'Brien, Thomas K. McCarthy and Thelen, Marrin, Johnson & Bridges for Respondent.

BRAY, J.—Appellant medical board, after hearing an accusation filed with it against respondent, found him guilty of unprofessional conduct as defined in section 2392 of the Busi-

ness and Professions Code. It ordered his license to practice as a physician and surgeon suspended for one year, and then suspended its order for a five-year period of probation, on condition that he comply with the laws of the United States and of the State of California and rules and regulations of the board, and that he personally report to the board at each of its regularly scheduled San Francisco meetings.

Thereafter respondent petitioned the superior court for a writ of mandate to set aside the decision of the board. The hearing of the alternative writ was had on the pleadings, the stipulations of the parties and the transcript of the proceedings before the board. No additional evidence was offered. Exercising its independent judgment, as it was authorized to do (*Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301 [196 P.2d 20]), the trial court set aside the action of the board and entered judgment in favor of respondent. The board appealed.

## QUESTION PRESENTED

The primary question for us to determine "is whether the evidence, viewed in the light most favorable to petitioner, sustains the findings of the trial court to the effect that the charges against petitioner were not supported by the weight of the evidence." (*Moran* v. *Board of Medical Examiners, supra,* p. 309.) Involved in this question is that of whether there is substantial evidence to support the court's findings that the doctors employed by respondent were (1) registered with the board, and (2) interns.

As to the second count in the accusation, the main question is whether guilty knowledge is necessary in a charge of aiding and abetting an unlicensed person to practice medicine.

## FACTS

Taking the evidence and the reasonable inferences therefrom most favorable to respondent, the facts follow. (Actually there is little, if any, conflict in the evidence. The bulk of the testimony is that of respondent himself and one of the unlicensed physicians, Keene. However, there is considerable conflict in the inferences which the parties draw from the testimony.) The first count of the accusation charged respondent with employing 10 unlicensed physicians, including Dr. Flint (one was later withdrawn) ; the second count referred to Dr. Flint alone and charged respondent with aiding and abetting him to practice medicine. It is admitted that none of the physicians in question had ever been licensed to practice

in California.* Each was a graduate of an approved medical school, and had served an internship in an approved hospital, had received an M.D. degree, and had been licensed to practice medicine in another state, and was eligible to licensure in California on a reciprocity basis. All were employed by respondent at his hospital from August 20, 1945, to May 17, 1946; all, except Keene and Murphy, were paid salaries ranging from $125 to $225 per month, and resided at the hospital. All except Keene and Murphy were assigned to the hospital during the war (prior to May, 1945) by the Procurement and Assignment Board (a medical adjunct to the War Manpower Board) for the performance of medical services under supervision.

Certain exhibits presented to the board also showed that Dr. Garfield maintained a ''call-board'' at the hospital which listed no interns, but listed some of these unlicensed persons as doctors; that a list of respondent's employees included categories of ''staff physicians,'' ''interns'' and ''residents,'' and none of the unlicensed persons in the accusation was listed as ''intern.'' Also a schedule of duties refers to some of the unlicensed persons, but not as interns.

### FINDINGS

The trial court found that Permanente Foundation Hospital was operated by petitioner and approved by the board for the training of interns (no question of approval was involved, and it is still approved) ; that all of the persons named in count I except Flint were graduate students registered with the board and engaged as interns for the purpose of study; that to the extent such persons treated the sick, etc., it was under supervision, and for the purpose of obtaining education and training; that at no time referred to in said accusation did the board issue any regulations for the registration of interns, nor did it file any regulations for the registration of interns with the Secretary of State, or otherwise comply with the provisions of the Government Code, particularly chapter 4, part 1, division 3, title 2 (which requires filing of regulations) ; that the findings of the board that petitioner employed unlicensed persons are not supported by the weight of the evidence; that the findings of the board that the employment of such persons was not during a course of study and that they were not employed as interns, and that petitioner knew such

---

*Except Dr. Flint, whose license was revoked. He will be omitted in the discussion of the first count except when specifically mentioned.

facts, were not supported by the weight of the evidence; that on the contrary, the weight of the evidence was that such persons, other than Flint, were graduate students pursuing a course of study in the practice of medicine and surgery, engaged as interns, and registered with the board.

### STATUTORY PROVISIONS

Those applicable at the time involved here follow. Section 2141, Business and Professions Code, prohibits any person from practicing any mode of treating the sick or prescribing for any mental or physical condition without having the certificate to practice provided in the code. Section 2142 makes it a misdemeanor for anyone without such certificate to use the prefix "Dr." or the letters "M.D." implying that he is a physician and surgeon or either. Section 2392 provides: "The employing, directly or indirectly, of any suspended or unlicensed practitioner in the practice of any system or mode of treating the sick or afflicted or the aiding or abetting of any unlicensed person to practice any system or mode of treating the sick or afflicted constitutes unprofessional conduct within the meaning of this chapter." This is the section which the first count of the accusation charges respondent with violating. The second count charges him with violating section 2378: "The violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of or conspiring to violate any provision or term of this chapter constitutes unprofessional conduct within the meaning of this chapter."

Inasmuch as it is conceded that none of the physicians had the necessary certificate to practice, it is necessary that the evidence bring them within the exceptions provided by the statute.

Section 2147.5 provides: "*Any graduate student registered with the board* and upon whom a degree of doctor of medicine, bachelor of medicine, or doctor of osteopathy has been conferred by a school, approved by the board, and any regularly matriculated student in a school approved by the board, *may, during and as a part of his course of study,* but not for a period of more than two years, treat the sick and afflicted either as such student in a school approved by the board, teaching medicine, surgery or osteopathy in this State, *or as an interne* in a hospital approved for the training of internes and may, for rendering such treatment, receive compensation therefor from the hospital or school.

"Except to the extent authorized by this section, *no*

*graduate student may treat the sick or afflicted or receive compensation therefor, or otherwise engage in or offer to engage in the practice of medicine or surgery."* (Emphasis added.)

All were graduate students of and held M.D. degrees from schools approved by the board. (It was stipulated that it would not be claimed that the two year limitation had been violated.) Permanente is a hospital approved for the training of interns by the American Medical Association, American College of Surgeons and by the board. The questions to be determined under the first count are, was there substantial evidence to show that (1) they were registered with the board, and (2) they were interns. (It is not contended that Permanente is a school approved by the board teaching medicine, etc.)

1. REGISTRY

With the exception of letters written to the board by Doctors Keene and Murphy asking to be admitted to practice and stating they were residents at Permanente, there is no claim of actual registration with the board of any of the other physicians, even though the court found that they had so registered. It is respondent's position (a) that the statutory requirement is merely directory and not mandatory, and (b) that the necessity for registration was obviated by the failure of the board to adopt regulations concerning registry.

a. *Is registration mandatory?*

The section provides, "Any graduate student registered with the board" may as an intern treat the sick. It is clear from reading the section that registry is an important element of the situation in which an unlicensed person may treat the sick, and is mandatory. Respondent's attempt to read a different legislative intent into the section is unfounded. He refers to the fact that the section, on the second reading of the bill, was amended to provide that the section would not apply to a graduate student who prior to undertaking graduate work had failed to register. This amendment was stricken out before final passage. If this fact has any bearing on the subject, it would indicate that the Legislature was unwilling to permit even graduate work without registry, and strengthens, rather than weakens, the position that the section is mandatory. *Estate of Mitchell,* 20 Cal.2d 48 [123 P.2d 503], cited by respondent, is not in point. It was held in *Mann* v. *Board of Medical Examiners,* 31 Cal.2d 30 [187 P.2d 1], that the fact that a number of graduates of a certain medical school had

been admitted to practice by the board, did not constitute an approval of the school and, in effect, that the provision requiring approval of the school by the board was a mandatory one.

b. *Was nonregistry excused?*

Admittedly the board had never adopted any rule or regulation upon the subject of registration. There had been, however, an "Interneship Registration Card, Required by Chapter 341, Statutes 1939" adopted by the board, which card stated that it was "To be filed by every graduate of a medical school not licensed in California who is serving an interneship or a resident service in a California Hospital." Section 11380 of the Government Code defined regulations of a state agency and section 11381 provided for the filing of such regulations with the Secretary of State and stated that a regulation becomes effective a certain time after filing. Respondent contends and the court found that the board's failure to adopt a regulation on registration and to file the same with the Secretary of State excused him from complying with section 2147.5 of the Business and Professions Code. He cites no authority to support this position. ■ Section 2147.5 is self-executing. There is no provision in the Government Code requiring regulations to be adopted concerning self-regulating provisions of the code. Before a person can treat the sick he must register with the board. The burden is on him. The board had registry forms. It needed no regulations other than the form which it had adopted. It is interesting to note that all of respondent's employees who were carried on the hospital records as "interns" had complied with the section by registering with the board on these cards. The fact that the card contains a statement that it was used for both interns and residents does not affect the requirement that interns must register. In view of the statute, it was the duty of the physicians to apply to the board for registration.

There is no evidence that the other physicians applied to the board in any way for registry; therefore the charges of unprofessional conduct are proved against respondent in employing nonregistered persons, even if it be assumed that Doctors Keene and Murphy had applied for registration. The letter written by Dr. Keene (presumably that of Dr. Murphy was similar) enclosed a completed application form for California licensure. It in nowise asked for registry as an intern. It stated that he was a resident in surgery at Permanente.

In no sense could this letter be a compliance with the statutory requirement.

Respondent contends that inasmuch as appellants offered no evidence that the physicians were not registered it must be presumed that the interns obeyed the law and that that presumption is sufficient to support the court's finding. He cites *Head* v. *Wilson*, 36 Cal.App.2d 244 [97 P.2d 509], which was an action for damages resulting from a collision between defendant's automobile and a county ambulance causing the ambulance to careen into plaintiff's store and service station, setting the store on fire and otherwise damaging his property. In holding that the trial court erred in giving an instruction to the effect that if the county permitted the ambulance driver to drive without a license the county was prima facie negligent, the higher court said (p. 253) : ''While there is no evidence that Biggs did not have a driver's license, it is a misdemeanor to drive a motor vehicle without one. There is a presumption that he obeyed the law in this respect, which is the only material evidence in the record on this subject. There is no evidence, therefore, to justify the giving of this instruction.'' It is obvious that such case is not in point here. Nor is *Robbins* v. *Hercules Gasoline Co.*, 80 Cal.App. 271 [251 P. 697], where, in an action for damages for injuries received by falling into an excavation in a sidewalk, it was held, where there was no evidence on the subject, that it would be presumed defendant had obtained the necessary permit to make the excavation. Nor is *City of National City* v. *Dunlop*, 86 Cal.App.2d 380 [194 P.2d 788], in point either. That was an action brought by the city to eject defendants from certain real property. On appeal, it was held that in considering whether or not to accept the testimony of the superintendent of streets and the city engineer as proof that notices of street vacation had not been posted the trial court had the right to consider the presumption that official duty had been legally performed and the law obeyed.

The case applicable to the situation here is *Anderson* v. *Board of Dental Examiners*, 27 Cal.App. 336 [149 P. 1006]. There the petitioner, a licensed dentist, had been accused in a proceeding before the Board of Dental Examiners of unprofessional conduct in employing unlicensed persons to practice dentistry. After holding that it was Anderson's duty before employing the person in question as a dentist to find out if he were licensed, the court answered Anderson's contention that the evidence failed to disclose that the person

was not licensed, by saying that the board could take judicial notice of the persons it had licensed. The court then put the burden of proof on Anderson, stating (p. 340): "It would have been an easy matter for petitioner to produce proof of the fact that Munn had been licensed if such were the fact, for by the statute the board is charged with the duty of keeping a roll of licensed practitioners; and under these circumstances it would be idle to say that it could not judicially notice who were and who were not duly licensed."

2. WERE THE PHYSICIANS INTERNS?

Dr. Garfield testified that the unlicensed doctors (except Flint, Murphy and Keene) were carried on the hospital records as residents, and that this did not mean residents in the sense, as in some hospitals, of doctors acting without supervision; that at Permanente first year interns were called interns, but the second year men were called junior residents. The six doctors were paid in salary ranges from $125 to $225 per month plus maintenance, which was the salary paid interns, the first year men getting $125 and the second year men $225. Gould's Medical Dictionary (Fifth Revised Edition, 1941) defines an intern as "An in-door or resident physician in a hospital." Webster's International Dictionary (Second Edition, Unabridged, 1941) defines an intern as "A resident physician, surgeon, or similar officer in a hospital; specif., one who upon completion of the required course of study serves in a hospital in preparation for independent practice." While there is considerable evidence upon which the court could have found that the six doctors were not interns, there is substantial evidence together with the reasonable inferences which could be drawn therefrom that they were.

But a different situation arises in the cases of Doctors Keene, Murphy and Flint. (As far as Flint is concerned, he was considered by respondent to be a licensed physician and surgeon and not an intern.) Dr. Keene, a graduate of the University of Michigan Medical School with the degree of M.D. and of M.S. in surgery, was licensed to practice medicine in the State of Michigan in 1935 and practiced there until 1941. From 1942 until January, 1946, he was in the medical department of the United States Army, during which time he served in various capacities, such as chief surgeon for the Lovell General Hospital in Massachusetts, surgeon for the 311th General Hospital, surgical consultant for the 26th Hospital Center in Manila, surgical consultant for the 24th Corps Army Service. After a conversation with respondent,

who was the medical consultant to the Kaiser Fraser Company, Keene contacted the company at Willow Run, Michigan, and apparently was offered the position of medical director and surgeon for them. In February, 1946, he arranged with respondent to come to Permanente to observe their methods and to take a refresher course in industrial medicine and surgery and to learn the administration aspects of an industrial hospital. He "worked in the Out Patient [department], under the direction of the doctors there, and discussed the industrial cases with them"; he "had no understanding concerning hours," and "was around there almost all the time." He received $700 per month from the hospital, "according to the dignity of his position." He prescribed "the usual physio therapy, or some times novocaine injections, . . . a form of aspirin——" He assisted in doing surgery, "The duties of a regular assistant, and occasionally . . . did minor procedures under the direction of another man." He saw outpatients in the absence of other physicians in the room but the latter were in the hospital. He examined outpatients, noted findings and prescribed a course of treatment for them. "Q. And in what way did your conduct of these examinations and prescribing treatment differ from your practice as a physician if there is any? A. No difference. Q. In other words, the things you were doing there in this hospital were the same as you did in your private practice at home, is that right? A. No, (sic) except that when I was in private practice I had no one to supervise me. Q. But as far as your actual conduct of these operations of one kind or another, you proceeded as a trained physician, isn't that true? A. It is." It was understood that he would be called a resident. His definition of resident was "any physician who lives or works exclusively in a hospital for the purpose to gain knowledge." In his experience the only distinction between an intern and a resident is in the degree of experience, a resident having more experience than an intern and is given much less supervision. He made no application to the board other than the one heretofore discussed. It was stipulated that if Dr. Murphy were called as a witness his testimony would be substantially the same as that of Dr. Keene except that his specialty was obstetrics while Keene's was surgery. Murphy also received $700 per month. Respondent classified Keene as an intern, as a man in training—"We called him a resident . . . he was there to learn under the refresher course . . ."

The directory at the entrance to the hospital commenced

with Dr. Garfield "& Associates." Then followed the names of certain doctors. Under the heading "Obstetrics and Gynecology" appears "Joseph Murphy M. D." Murphy was not licensed to practice in California, and having in mind section 2142 of the Business and Professions Code had no right to use the letters "M. D." nor did respondent have the right to so list him.

Plaintiff's Exhibit 3, "Essentials of An Approved Internship, Prepared by the Council on Medical Education and Hospitals of the American Medical Association," upon which respondent testified Permanente's intern-training program was based, states: "The internship is a form of apprenticeship. The intern assists in the care of patients and receives in return instruction from the hospital staff in the clinical and laboratory aspects of his profession. 2. LENGTH OF INTERNSHIP.—An internship should be of not less than twelve months' duration. . . ." Then follows a definition of the types of internship, all requiring "supervised experience" in the work to be undertaken. Other provisions applicable here are: "Assignments should be made so that the intern has opportunity each day to meet his attending physician for the conduct of systematic ward rounds or clinics and for the study of the patients under his care. . . . Each intern on duty in any clinical department should write or dictate the history, physical examination and his own diagnostic impression of all patients assigned to him. He should have laboratory work assigned to him of such nature as to give him familiarity with clinical laboratory methods and to develop in him competence in the use of all those which the average physician may be called on to perform. The nonoperative treatment of each patient should, in the main, be his responsibility under critical guidance by the visiting physician. The intern's record should be checked within 24 hours by a competent supervising physician, calling attention to errors in observation and adding supplementary notes containing any relevant data which the intern may have omitted. . . . 1. BEDSIDE TEACHING.—The most important phase of intern instruction consists in well conducted teaching at the bedside. By this is meant systematic instruction of the intern by the attending physician with an ample discussion of the history, the clinical and laboratory findings, the diagnosis and the treatment of each patient. . . . 3. INTERNAL MEDICINE.—This department should afford each intern an adequate amount of instruction and experience in

general medicine and in such special medical technics as transfusion, intravenous and other parenteral therapy, and paracentesis. . . . 4. SURGERY.—Surgical training should be planned to emphasize diagnosis and preoperative and postoperative treatment of surgical cases rather than skill in operative technic. Thus the intern's work in surgery should be rather that of an assistant than of an operator. . . . 5. OBSTETRICS.—The intern should obtain training and experience by delivering under supervision at least 10 patients. At other deliveries he should act as an assistant, not merely as an anesthetist. 6. PATHOLOGY.—The intern should receive experience in clinical laboratory work to perfect his skill in routine laboratory procedures. He should also receive instruction from the pathologist in the procedures of pathologic diagnosis. . . . 7. OUTPATIENT DEPARTMENT.—It is desirable that each intern should have supervised experience in outpatient work under circumstances comparable to the office practice of medicine. . . . 5. RELATIONSHIP BETWEEN HOSPITAL AND INTERN.—To avoid misunderstanding, it is desirable that each intern at the time of his appointment should enter into a formal agreement with the hospital defining mutual obligations. . . ."

▮ While respondent now calls Doctors Keene and Murphy "interns" it is stretching one's imagination beyond all limits to so characterize them. Comparing these rules with the duties performed by Doctors Keene and Murphy, it is obvious that they were not interns. They were physicians and surgeons who undoubtedly had come to the hospital for a certain amount of refreshing but who were actually practicing medicine the same as any other practitioners except that they were under supervision. Boiled down, respondent's contention is that because interns act under supervision and the doctors here acted under supervision, ergo, they were interns. To hold that men with the medical experience of these men, doing the type of work they were doing at Permanente, and receiving the salaries they received, are interns, would make such a wide hole in the statute as to make it practically unenforceable. Courts have to be realistic and not misled by attempts to attach a nomenclature which is completely unfounded.

### SECOND COUNT

▮ The parties have stipulated, upon their respective applications for a rehearing, that the issues of the second count of the accusation were determined by the board upon the

assumption that certain evidence (of the circumstances surrounding the reemployment and continuation of the employment of Dr. Flint by respondent) were admitted in mitigation, only, and that, if this court is of the opinion that such evidence should have been admitted without limitation, the issues of the second count should be remanded to the board for further proceedings without directions, other than to overrule the objection to the admission of such evidence. The court is of the view that the disposition of the issues of the appeal relating to the second count proposed by the stipulation of the parties is a proper one and that the issues raised in connection with the second count should be first tried out before the board upon such evidence as the parties may there produce without a specific holding on this appeal as to the sufficiency of respondent's evidence in the present record, which was received for the limited purpose of mitigation.

### JUDGMENT AGAINST INDIVIDUAL MEMBERS OF BOARD

*Moran* v. *Board of Medical Examiners, supra* (32 Cal.2d 301), holds that incumbent members are proper but not necessary parties to a mandamus proceeding. The record fails to show service of process on board members French, Fleming and Nelson, or on former members Otto and Scatena. Respondent concedes that the judgment against these unserved members is improper.

### CONCLUSION

■ While there is substantial evidence to support the court's findings that the doctors, other than Keene, Flint and Murphy, were interns, there is no evidence that they were registered with the board. For that reason, and for the reason that the evidence shows conclusively that Doctors Keene, Flint and Murphy were not interns, the action of the trial court in finding (under Count I) that respondent was not guilty of unprofessional conduct, was erroneous.

The board made a single order of suspension based on its findings and conclusions that both counts had been violated. Inasmuch as we hold upon stipulation of the parties that in the interests of justice and those of the respective parties, the second count of the accusation should be remanded for the overruling of the board's objections to certain evidence offered in defense and received only for the purpose of mitigation, and since the suspension of one year is a drastic penalty, even though, by the probationary order, its effect has been considerably lessened, and moreover, as we have no way of know-

ing what penalty the board would have imposed for violation of count I alone, the judgment will have to be reversed and the matter sent back to the board for reconsideration of the penalty. (See *Cooper* v. *State Board of Medical Examiners*, 35 Cal.2d 242 [217 P.2d 630].)

The judgment is reversed and the trial court is directed to enter judgment commanding appellant board to set aside its order of suspension and further directing the board to reconsider the case and redetermine its order in the light of this court's opinion and judgment.

Peters, P. J., and Schottky, J. pro tem., concurred.