[Civ. No. 26350. Second Dist., Div. Four. Aug. 6, 1963.]

IRVING S. TUSHNER et al., Plaintiffs and Appellants, v. WYNNE A. SAVAGE, as Real Estate Commissioner, Defendant and Appellant.

Alvin Hirsch, Ball, Hunt & Hart, Joseph A. Ball and Joseph D. Mullender, Jr., for Plaintiffs and Appellants.

Stanley Mosk, Attorney General, and Arthur C. de Goede, Deputy Attorney General, for Defendant and Appellant.

KINGSLEY, J.—This case involves appeals by both sides from a judgment of the superior court in a writ of mandate proceeding to review an order of the Real Estate Commissioner revoking the real estate licenses of Irving S. Tushner and Louis Harry Ragins.

Since 1951, Tushner has been conducting a mortgage loan brokerage business under the name of Union Mortgage Company. From 1953 to 1959 Ragins was Tushner's partner. However, since 1959 Union Mortgage Company has been operated solely by Tushner. The function of a mortgage loan broker is to arrange a loan for a borrower to be secured by a trust deed or other lien on the borrower's real property.

In 1955, the Legislature enacted the Real Property Loan Brokers' Law, which became effective October 1, 1955.[1] The purpose of the law was to regulate the activities of persons engaged in the business of negotiating loans secured by real property.

In March 1956 the Department of Finance commenced an audit of Union Mortgage Company for the period of October 1, 1955, through March 1, 1956. The purpose of the audit was to determine whether there was compliance with the new law. On July 30, 1956, the Department of Finance made its report to the Real Estate Commissioner. The report was based on an examination of 50 per cent of Union's loan transactions, which would have been aproximately 250 loans for the period in question.

On April 4, 1957, the commissioner filed an accusation alleging violations of the Real Property Loan Brokers' Law with respect to 14 of the 250 loan transactions which had been audited. An administrative hearing was held. The hearing examiner made findings and determinations that Tushner and Ragins had negotiated usurious loans; that they acted for both lender and borrower without full disclosure; and that they made excessive loan charges. The hearing officer recommended that their real estate broker's license be revoked.

The findings of usury were based on the fact that the purported lender, Ester Flink, who was Tushner's sister, was merely the *alter ego* of Tushner and Ragins. This conclusion was based on the fact that most of the monies used by Flink to make the loans came out of bank funds deposited by Tushner and Ragins to the account of Flink, and that Flink kept her money in a safe deposit vault. Since Tushner and Ragins were, in fact, the lenders in these instances, the effect of adding the broker's commission to the interest stated in the loan

---

[1] Civ. Code, §§ 3081.1-3081.93. These sections terminated by their own terms in 1959, and were replaced by sections 3081.01-3081.096, which were repealed in 1961 by Stats. 1961, ch. 886, p. 2343, § 29.

increased the total interest exacted to more than the permitted 10 per cent.

The evidence in support of failure to disclose dual representation was that, on certain loans, the lenders were employees or close relatives of Tushner and Ragins, making the lenders their *alter ego*, which fact was not disclosed to the borrowers.

As to excessive loan charges, it was found that, on all loans, charges were made for a credit investigation in the amount of $15, and for an appraisal in the amount of $27.50. These charges were paid to Secured Investment Corporation, which also was found to be the *alter ego* of Tushner and Ragins, and the cost to Secured Investment Corporation to render these services was found to be less than that charged by Union to the borrowers.

On June 12, 1958, the commissioner adopted, *in toto*, the proposed decision of the hearing officer and made an order revoking Tushner's and Ragins' real estate broker licenses. A petition for reconsideration was denied by the commissioner on July 23, 1958.

On July 29, 1958, Tushner and Ragins (hereinafter referred to as ''licensees'') filed a petition for writ of mandate in the superior court for review of the commissioner's orders. The case was tried, and on July 14, 1960, the trial judge filed a memorandum opinion and order for judgment. This opinion was modified on July 28, 1960. Findings of fact and conclusions of law were filed on September 6, 1961. On October 20, 1961, the trial court filed another memorandum opinion. The findings of fact and conclusions of law were thereafter amended on November 21, 1961, and again on January 16, 1962. The effect of the findings, as amended, insofar as pertinent to this appeal, was that the court sustained the determination of usury on the Flink loans, and sustained the charges of dual representation and excessive appraisal and investigation fees insofar as they were alleged in the accusation, but remanded the case for reconsideration of penalty. Judgment was entered on January 17, 1962, and a peremptory writ of mandate issued to remand the case for reconsideration of penalty. The licensees appeal from the judgment insofar as it sustains any of the commissioner's findings. The commissioner, in his appeal, contends that all findings should have been sustained, and that the case should not be remanded.

1. *Did the Real Estate Commissioner have jurisdiction to discipline a real estate broker for violations of the Real Property Loan Brokers' Law occurring in 1955 and 1956?*

In order for the Real Estate Commissioner to have jurisdiction to revoke a real estate broker's license, the licensee must have been guilty of misconduct connected with his activities as a real estate broker. (*Schomig* v. *Keiser* (1922) 189 Cal. 596, 598 [209 P. 550]; *Buckley* v. *Savage* (1960) 184 Cal.App.2d 18, 26 [7 Cal.Rptr. 328].) However, licensees argue, there is no evidence that they acted as real estate brokers, or that any of their alleged violations arose out of a real estate transaction. All of the evidence is that they were acting as mortgage loan brokers, and that their violations, if any, of the Real Property Loan Brokers' Law occurred in the performance of those functions. As a consequence, they contend, the commissioner lacked jurisdiction to revoke their licenses.

Business and Professions Code, section 10131, prior to its amendment in 1961, defining a real estate broker includes a person ''. . . who, for compensation, negotiates loans on real estate, . . .'' Section 10130 of the Business and Professions Code makes it unlawful for any person to engage in the business of a real estate broker or a real estate salesman without first obtaining a real estate license from the division.

Licensees acknowledge that section 10131, in part, includes in the definition of real estate broker one who for compensation negotiates loans on real estate for another but contend that this definition only applies in situations where there is a sale of real property. For this position they have cited no direct case authority, and our research has uncovered none to that effect. Furthermore, licensees contend that an analysis of the 1955 Real Estate Loan Brokers' Law and its subsequent amendments in 1959 and 1960 show that it was not until 1960 that a mortgage loan broker was required to be licensed as a real estate broker.[2] In 1960, the then section 3081.01 of the Civil Code was amended to provide that any person acting as a real estate property loan broker must first obtain a real estate broker's license and register as a real property loan broker. They assert it was not until 1961 that the Legislature amended section 10131 of the Business and Professions Code to define a real estate broker as including a person who solicits or negotiates loans or collects

---

[2] Civ. Code, § 3081.01 as amended by Stats. 1960, 1st Ex. Sess., ch. 77, p. 431, §§ 1 and 2. Repealed Stats. 1961, ch. 886, p. 2343.

payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property. This amendment, licensees assert, would have been totally unnecessary if the prior definition of negotiating loans on real estate had meant the same thing.

Thus, they contend, prior to 1960, at least, anyone could have been a mortgage loan broker, and *a fortiori*, a mortgage loan broker was someone other than a real estate broker. Therefore, the fact that licensees were real estate brokers is immaterial. They were not performing the normal functions of a real estate broker in conducting their loan business. Consequently, they conclude, the commissioner lacked all jurisdiction for subjecting their real estate licenses to discipline for alleged misconduct in their loan business.

Our interpretation of the history of this legislation does not support licensees' position. We believe that persons who negotiated loans on real property, were (and still are) required to be licensed as real estate brokers. They are therefore subject to discipline by the commissioner for violations of either the Real Estate Act or the 1955 and 1959 enactments of the Real Property Loan Brokers' Law. Since the 1919 amendment to section 10133 of the Business and Professions Code, one was required to be licensed as a real estate broker in order to negotiate loans on real property. The 1955 legislation was merely a further regulation of such negotiations, primarily concerned with commissions, costs, and expenses, balloon payments and information to be provided the borrower concerning costs incurred in securing the loan. The 1959 provisions required one not only to be *licensed* as a real estate broker in order legally to negotiate loans on real property, but also required him to *register* with the commissioner as a real property loan broker.

It follows that the commissioner had jurisdiction to discipline licensees for the derelictions herein involved.

2. *Are the administrative and trial court's findings supported by the evidence?*

I

The hearing officer found that the licensees ". . . transacted usurious loans in violation of sections 3081.3, subdivision (c), and 3081.92 of the Civil Code which constitutes a cause for disciplinary action under the provisions of section 10176, subdivision (i), 10177, subdivision (j) and 10177,

78

subdivision (f), of the Business and Professions Code, thereby subjecting their licenses and the right to renewal thereof to disciplinary action as provided by sections 10176, 10176.1 and 10177 of said Code.''[3]

It is well settled that, where a lender charges interest plus a brokerage fee on a loan, the fee is added to the rate of interest to determine whether or not the loan is usurious. (*Haines* v. *Commercial Mortgage Co.* (1927) 200 Cal. 609 [254 P. 956, 255 P. 805, 53 A.L.R. 725] ; *Wheeler* v. *Superior Mortgage Co.* (1958) 160 Cal.App.2d 246 [325 P.2d 156].) But the broker's commission cannot in any event be called interest unless the broker is also the lender. To cross this hurdle the hearing officer found that licensees were lending their own money. Both the trial court and the hearing officer found that Flink, Tushner's sister, was merely the *alter ego* of the licensees in these transactions. There is ample evidence to show that the licensees deposited most of the funds in the Flink account, and that they dominated both her and the account. Flink testified that she kept her own money in a safe deposit vault. The evidence adequately substantiates the finding that licensees were, in fact, lending their own money.

Whether resort is had to the *''alter ego''* concept (which the facts and circumstances adequately justify), or to the familiar concept of an undisclosed principal, it is clear that the Flink loans were squarely within the inhibition of section 3081.92 of the Civil Code quoted above in footnote 3. The licensees' contention as to this point is without merit.

Licensees further argue that, assuming *arguendo* that the finding of *alter ego* may be sustained so that the Flink loans may be treated as their loans, they are not usurious because they were ''interim loans'' only.

Interim lending occurs when the loan broker temporarily advances his own money to the borrower pending the negotiation of a loan with a third-party lender. In such situations the broker's commission is not treated as interest.[4]

---

[3]Section 3081.3 of the Civil Code establishes a maximum interest rate of 10 per cent per annum in the circumstances herein involved.

Section 3081.92 of the Civil Code provides: ''The provisions of this chapter pertaining to maximum costs and expenses, charges, and interest, together with the penalties stated in this chapter, shall apply to any transaction involving a third party as a purported lender or any other transaction which is used as a subterfuge or means of avoiding or evading the provisions of this chapter.''

[4]The licensees cite the following cases as supporting this position: *Equitable Mortgage Co.* v. *Craft* (8th Cir. 1893) 58 F. 613; *Webb* v.

It will be noted that no California cases exist which have adopted the "interim lending" concept. It is not and should not be part of the California law. However, even if the concept were to be adopted, the cases cited by licensees do not avail them under the facts herein involved. At the best, "interim lending" arises where the broker contemplates arranging a loan for a known ultimate lender who, at the moment, is not in a position to advance funds needed currently by the borrower. As to only two of the loans is there any showing that licensees had any specific ultimate lender in mind—the loans were made merely in the hope that they could ultimately be sold to some, at that date unknown, future investor. The two other loans were assigned to Secured Investment Company. As we have above pointed out, since Secured Investment was a mere trade name for licensees, there was no real assignment and those loans were usurious.

 The licensees' last contention in regard to the findings of usury is that, since the theory to support such is that they were lenders, then they could not have violated Civil Code sections 3081.3, subdivision (c), and 3081.92, since those statutes were expressly made applicable only to persons other than lenders by section 3081.1 of the Civil Code.[5] However, it was sections 3081.7 and 3081.8 of the Civil Code which provided the exemptions from the statute and not 3081.1. All that section 3081.1 purportedly provides is that a lender need not deliver the statement in writing required by section 3081.2 before the borrower becomes obligated to complete the loan.

---

*Southern Trust Co.* (1928) 227 Ky. 79 [11 S.W.2d 988]; *Ashland Nat. Bank* v. *Conley* (1929) 231 Ky. 844 [22 S.W.2d 270]; *Chenault* v. *Southern Trust Co.* (1932) 245 Ky. 305 [53 S.W.2d 369].

[5] Section 3081.1 provided: "Every person, other than a lender, who, for compensation payable by a borrower either directly or from the proceeds of a loan, negotiates a loan to be secured by real property must, before the borrower shall be obligated to complete the loan, deliver to the borrower a statement in writing, containing all the information required by section 3081.2. Such statement and any other compensation agreement with the borrower shall be executed at the place of business of the person negotiating a loan as specified in his license. It shall be personally signed by the borrower, and by the person negotiating the loan or his authorized representative. The person negotiating the loan, or his authorized representative, in said statement shall certify that the loan is being made in compliance with the provisions of this chapter. When so executed, an exact copy thereof shall be delivered to the borrower at the time of its execution. The person negotiating the loan shall retain on file for a period of three years after the date of such statement a true and correct copy thereof as signed by the borrower."

Furthermore, section 3081.92 of the Civil Code provided: ''The provisions of this chapter pertaining to maximum costs and expenses, charges, and interest, together with the penalties stated in this chapter, shall apply to any transaction involving a third party as a purported lender or any other transaction which is used as a subterfuge or means of avoiding or evading the provisions of this chapter.''

To allow a person, who purports to act as a loan broker, and, in fact, is acting for himself without disclosing this fact, to claim that he is not within the provisions of the Real Estate Loan Brokers' Law, would be to completely undermine and circumvent the purposes of this legislation and render it impotent against the very ills and unethical practices it was intended to remedy. Therefore, neither in reason nor in logic do we find merit in licensees' argument that they do not come within the provisions of the Real Estate Loan Brokers' Law.

## II

Licensees also attack the finding that they violated Business and Professions Code, section 10176, subdivision (d), by ''[a]cting for more than one party in a real estate transaction without the knowledge of all parties thereto.'' In support of their position they claim that the lenders on these loans were their employees or close relatives and that the mere fact that this relationship was not disclosed to the borrowers is in no way a violation of section 10176, subdivision (d). We cannot agree. The fallacy of this whole line of reasoning is the premise that a failure to disclose a relationship constitutes a finding of dual representation. As stated earlier, both the hearing officer and trial court found that the licensees were the lenders, because Flink was merely their *alter ego* in these transactions. This finding is substantially supported by the evidence. The alleged violation of section 10176, subdivision (d), lies in the fact that the licensees acted both for the borrower and lenders (themselves) without making such disclosure. Such is a violation of section 10176, subdivision (d). (*Buckley* v. *Savage* (1960) 184 Cal.App. 2d 18 [7 Cal.Rptr. 328]; cf. *Abell* v. *Watson* (1957) 155 Cal.App.2d 158 [317 P.2d 159].)

The commissioner is also here appealing from the trial court's determination that the hearing officer went beyond the scope of the accusation in finding that the licensees violated section 10176, subdivision (d), as to the first, second, third and fourth grounds of the accusation, because only the

first ground charged them with violation of 10176, subdivision (d). The trial court then concluded that, since it could not be determined whether the hearing officer's recommendation of the penalty would have been the same if the licensees were charged only with violation of section 10176, subdivision (d), as to the first ground of the accusation, the matter should be remanded for reconsideration of penalty. We see no error in the trial court's determination in this regard.

III

The third violation determined was that licensees made excessive loan charges in violation of Civil Code sections 3081.2, subdivision (a), and 3081.3, subdivision (a); and in violation of California Administrative Code, title 10, section 2843.[6] Such constitutes cause for disciplinary action under the provisions of section 10177, subdivisions (d), (f) and (j), of the Business and Professions Code, thereby subjecting their licenses and the right to renewal thereof to disciplinary action as provided by sections 10176.1 and 10177 of the said Code.

The trial court found that the hearing officer abused his discretion in determining that there were violations of Civil Code section 3081.2, subdivision (a), in that there was no evidence to support such a finding. It appears from the record that the licensees did fully comply with the requirements of this section. Licensees did in fact set forth the estimated maximum costs and expenses of making the loans which were to be paid by the borrower. It appears to us that section 3081.2, subdivision (a), requires no more than the itemization of the *estimated maximum* costs and expenses of making the loan. Conceivably, the broker may not know what the exact amount of the charges will be when the statement is first delivered. Therefore, we see no error with the trial court's finding on this point.

On the other hand, licensees contend that they could not have violated title 10, section 2843, of the Administrative Code because such was not promulgated until September 19, 1957; and the evidence does not support the finding that they violated section 3081.3, subdivision (a).

Section 2843 of title 10 of the Administrative Code now provides as follows:

"The costs, expenses and charges specified in section 3081.3 are the maximum rates chargeable and are to be levied only

---

[6]This provision of the Administrative Code will be set forth and discussed *infra*, in the body of the opinion.

when such costs, expenses and charges can be supported in fact. *Such charges shall not exceed similar charges made for similar services in the community where such services are rendered.''* (Italics added.)

However, the 1957 amendment merely added the emphasized sentence of the section. The pertinent language here is contained in the forepart which was in force at the time of licensees' transactions and contravenes licensees' contention.

The trial court, upon substantial evidence, found that the charges made pursuant to section 3081.3, subdivision (a), were not in fact "paid, incurred or earned" within the meaning of the statute. The evidence shows that Secured Investment, which made the appraisals and credit investigations, was in reality the *alter ego* of licensees. It was also established by substantial evidence that the cost actually incurred by Secured Investment for these services was less than that charged to the borrowers. Therefore, the trial court's finding is fully substantiated.

3. *Was the judgment of the trial court correct in remanding the case for reconsideration of penalty?*

It is an established rule that the determination of the penalty to be imposed by an administrative agency lies with the agency and not with the court. (*King* v. *Board of Medical Examiners* (1944) 65 Cal.App.2d 644, 652 [151 P.2d 282].) However, there is an exception when some of the charges are unsupported by the evidence and the court cannot ascertain from the record whether the same penalty would have been imposed had the administrative agency recognized the absence of evidence sufficient to support a part of the charges upon which the licensee had been found guilty. (*Thayer* v. *Board of Osteopathic Examiners* (1958) 157 Cal. App.2d 4, 9 [320 P.2d 28]; *Garfield* v. *Board of Medical Examiners* (1950) 99 Cal.App.2d 219, 231 [221 P.2d 705].) Upon this authority, the trial court did not err in remanding the case to the commissioner for reconsideration of penalty.

The judgment is affirmed.

Burke, P. J., and Jefferson, J., concurred.