[Civ. No. 13290. Third Dist. Dec. 7, 1972.]

HAROLD WINGFIELD, Plaintiff and Appellant, v.
JERRY W. FIELDER, as Director, etc., Defendant and Respondent.

## COUNSEL

LeRoy W. Rice and Herschel R. Cobb for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Sanford N. Gruskin, Assistant Attorney General, Carl Boronkay and Denis Smaage, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**BIDDICK, J.**\*—Harold Wingfield petitioned the Superior Court of Sacramento County for a writ of mandate to compel the Director of Agriculture of the State of California (Director) to set aside his decision revoking Wingfield's license as an aircraft pilot with a certificate of qualifications from the Director as required by section 11901 of the Agricultural Code. Wingfield sought a review of the order of the Director under the provisions of section 1094.5 of the Code of Civil Procedure, the administrative mandamus statute. Following a trial in the superior court, Wingfield's petition for a writ of mandate was denied and this appeal followed.

■ The Director's decision affected a vested right held by Wingfield as a licensee of the Department of Agriculture for the operation of an aircraft for the application of pesticides by air. The Director made the decision in the discharge of one of his functions as the director of a statewide agency of legislative—as distinguished from constitutional—origin. The superior court, reviewing the decision of the Director in this proceeding, is, therefore, authorized to exercise its independent judgment on the administrative evidence and to find an abuse of discretion only if the findings are not supported by the weight of the evidence. The substantial evidence test, on the other hand, applies in this appellate review of the superior court's judgment. (*David Kikkert & Associates, Inc.* v. *Shine* (1970) 6 Cal.App.3d 112, 115-116 [86 Cal.Rptr. 161]; *Merrill* v. *Department of*

*Assigned by the Chairman of the Judicial Council.

*Motor Vehicles* (1969) 71 Cal.2d 907, 915 [80 Cal.Rptr. 89, 458 P.2d 33].)

Wingfield was an employee of Delta Aerial Applicators, Inc., a corporation which was owned and managed by Jack Henderson. The Director, following a combined administrative hearing on accusations against Delta, Henderson and Wingfield, also ordered revocations of the licenses of Delta and Henderson. Delta and Henderson also filed petitions for writ of mandate in the Superior Court of Sacramento County and the three proceedings were heard together. The trial judge denied the writ sought by Delta and Wingfield but granted the petition of Henderson and remanded his case to the Director for the purpose of allowing him to reconsider the revocation.

The superior court granted Henderson's petition for the stated reason that Henderson as a private individual and as an employee of Delta could not be held responsible for the conduct of Wingfield as an employee of the corporation despite the fact that Henderson was the owner and manager of Delta. No reference was made in the court's decision to a separate finding by the Director involving careless flying by Henderson himself, resulting in damage to crops adjacent to an area being treated.

The appellant makes two contentions:

(1) That Agricultural Code sections 11791, subdivisions (b) and (c), 11792, subdivision (e), 14011, and title 3, California Administrative Code sections 2450, subdivision (h) and 3093, subdivision (a), as applied against Wingfield are void for vagueness.

(2) That the imposition of the penalty of license revocation was an abuse of discretion.

Wingfield was 43 years of age at the time of the episodes which gave rise to the license revocation. He had held an aircraft pilot's certificate of qualification in California since 1968, but prior to that time had worked as a crop duster in other states. His total experience in this line of work extended over six years. The accusation filed in this action is the first ever filed against him.

Following accusation, administrative hearing, review by the Director, and reconsideration, the Director made findings on five counts which are briefly summarized as follows:

(1) Wingfield on March 27, 1969, near Holt in San Joaquin County applied by aircraft the injurious herbicide 2,4-D to the Joe Wilson ranch without first obtaining a permit from the Agricultural Commissioner of

San Joaquin County and that the application was not made under the direct supervision of the agricultural commissioner.

(2) On March 27, 1969, near Holt in San Joaquin County, Wingfield operated in a faulty, careless and negligent manner and failed to exercise reasonable precautions when using 2,4-D so as to confine the material substantially to the premises intended to be treated and that this violation occurred when he released 2,4-D over the Ben Grimshaw home although the application was intended for the adjacent Joe Wilson ranch.

(3) Wingfield on March 27, 1969, near Holt operated in a faulty, careless and negligent manner by discharging from his aircraft 2,4-D directly over the home of Grimshaw without the authorization of Grimshaw.

(4) Wingfield, on or about April 11, 1969, near San Ramon in Contra Costa County operated in a faulty, careless and negligent manner and failed to use reasonable precautions when using 2,4-D to confine the material applied substantially to the premises intended to be treated and that this violation occurred when 2,4-D was released adjacent to a residential area when Wingfield was treating the farm of H. Weidman. It was further found that the spray was released in such a manner as to be likely to injure plants of value in the residential area and that such injury did in fact occur.

(5) Wingfield, on or about April 11, 1969, near San Ramon, operated in a faulty, careless manner in an aircraft engaged in agricultural pest control by flying at an unsafe altitude and in an unsafe manner over residences located adjacent to the farm of H. Weidman.

The evidence offered at the administrative hearing can be summarized as follows:

John Solari, a deputy agricultural commissioner for San Joaquin County, testified that the practice in the county was to issue permits for spraying operation based upon knowledge of the property involved. If Mr. Solari knew the property, he would know whether it was proper to issue the permit, and if he did not know the property, he would inspect it before issuing the permit.

On March 27, 1969, he saw a Delta plane conducting pest control operations in his area. He knew that he had not issued a permit to Delta and observed the spraying. As he watched, a drift of spray traveled approximately 100 yards and settled on his car. Solari then drove into the field where the swamp wagon was located, asked the swamper the nature of the

chemical and ascertained that it was a herbicide, 2,4-D, which was being used on a barley crop belonging to Joe Wilson.

While Solari continued to observe the operation, he saw the airplane fly over the Grimshaw home, adjacent to the crop being sprayed, and while over the television aerial turn on the spray. He went to the residence to check for damage and saw that the spray had injured fruit trees, flowers and leaves in the yard. Solari also testified that he returned to the Grimshaw property a week later with Marvin Switzenberg, another deputy agricultural commissioner, and noticed 2,4-D damage on Grimshaw's peach trees, poplar trees, berries and flowers. Switzenberg confirmed this.

Mrs. Grimshaw described the manner in which the airplane was flown around her house. She thought that the pilot flew too close to her house and also testified that fruit coming on the trees was deformed and the leaves were curled.

On April 11, 1969, Wingfield was again spraying 2,4-D on a field of barley located adjacent to a subdivision in San Ramon, Contra Costa County. Some of the spray drifted into the subdivision damaging plantings. Some 12 residents and homeowners claimed that plantings were damaged on their property. Six testified at the administrative hearing. One resident testified that she could see the spray drifting down the street and could smell it. She also saw the spray valve open as the plane was over the house at the end of the street. She thought that the plane was dangerously close to the houses.

Another resident was in the back yard of her home adjacent to the field and was covered with spray resulting from Wingfield's next-to-last pass. On his last pass, the spray was captured by the wind and carried into the neighborhood. Another resident thought that the plane was flying "pretty low" over the houses and saw it discharge spray over one house on the edge of the subdivision. Robert Meeks, a county agricultural inspector for Contra Costa County, went out to the subdivision the next day. He checked eight properties and found 2,4-D damage.

Wingfield testified that while spraying the Wilson field on March 27, he saw Solari's car in the area. Before spraying the Wilson place, he was working on another job. His employer, Henderson, arrived while the plane was down and told Wingfield to do the Wilson ranch. Wingfield testified that he never thought about the permit and assumed that it had been issued. He also testified that he had flown the field before, and added that he did not apply for the permits and that Henderson took care of that.

Wingfield saw Solari after he had made several passes but Solari did

not wave him down. Wingfield denied releasing spray over the Grimshaw property.

Wingfield also testified that he was flying for Delta near San Ramon on April 11 and that he flew in such a manner as to avoid the houses in order to preclude the possibility of an accident. He denied turning on the spray over houses but did state that he knew there was a drift so he turned on two or three hundred feet into the field. He also admitted that his last pass was one that he should not have made and it was poor judgment on his part. He did state that he thought there was no wind of any consequence.

After the accusation was filed against Wingfield, the Director offered to allow him to stipulate to a 30-day suspension, which offer was rejected. After trial before a hearing officer pursuant to the Administrative Procedure Act, the hearing officer recommended that Wingfield's license be suspended for a total of 30 days. The deputy attorney general presenting the case for the Department specifically declined to ask for a revocation of Wingfield's license. The Director, however, declined to follow the recommendation of the hearing officer and ordered revocation of the license.

Wingfield was found by the Director to have violated the following code sections, the provisions of which are set forth:

Section 11791 of the California Agricultural Code: "It is unlawful for any person that is subject to this division to do any of the following:

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(b) Operate in a faulty, careless, or negligent manner.

"(c) Refuse or neglect to comply with any provision of this division, or any regulation issued pursuant to it, or any lawful order of the commissioner.

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    ."

Section 11792 of the California Agricultural Code: "It is also unlawful for any person that is subject to this division to do any of the following:

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(e) Fail to comply with the provisions of Chapter 3 (commencing with Section 14001), Division 7 of this code."

Section 14011 of the California Agricultural Code: "It is unlawful for any person to apply any injurious material for which regulations have been

adopted except as provided in the regulations which are adopted by the director."

The relevant regulations referred to are contained in title 3 of the California Administrative Code and are set forth: "2451. Permits. (a) Injurious herbicides shall be used only under permit of the agricultural commissioner or under his direct supervision in any county in which there is a commissioner, or under permit of the Director in any county in which there is no commissioner, except as follows:

"     .     .     .     .     .     .     .     .     .     .     .     .     ."

"2450. General Regulations. The following provisions apply to all uses of injurious herbicides, whether or not a permit is required:

"     .     .     .     .     .     .     .     .     .     .     .     .     .

"(e) No injurious herbicide shall be discharged directly over or upon any property without authorization from the owner or operator of such property.

"     .     .     .     .     .     .     .     .     .     .     .     .     .

"(h) No injurious herbicide shall be used under circumstances where injury is likely to result to plants of value on property other than the property to be treated, either through drift of the herbicide during application or through subsequent movement of vapor or contaminated dust in the wind; nor at any time when the form of the herbicide, the method of application, the condition of surrounding crops, weather conditions, or other circumstances present risk of injury to crops."

"3093. Precautions. (a) All persons engaged for hire in the business of pest control, when using a method, or a material containing any substance, known to be harmful to persons, animals (including honey bees), crops, or property, shall exercise reasonable precautions to protect persons, animals, crops and property from damage, or contamination, and to confine the material applied substantially to the premises, crops, animals, or things intended to be treated.

"     .     .     .     .     .     .     .     .     .     .     .     .     ."

### THE VOID FOR VAGUENESS ATTACK

According to the findings of both the hearing officer and the Director, the substance of the offenses committed by Wingfield are that in two separate instances he operated his equipment in a faulty, careless and

negligent manner. The finding in the San Joaquin County case is that the negligent operation of the aircraft resulted in a failure to substantially confine 2,4-D to the premises intended to be treated and a discharge of 2,4-D over the property of a person without his authorization. In the San Ramon case, the finding was that the negligence in the operation of the plane resulted in the failure to substantially confine 2,4-D to the premises intended to be treated and that the spray was discharged under a condition likely to result in injury and actually resulting in injury to plants of value in an adjoining residential area. The other counts do not relate to the application of 2,4-D directly. The finding in count I was that Wingfield applied 2,4-D without first obtaining a permit in San Joaquin County and count V was that Wingfield was negligent in flying his plane at an unsafe altitude in an unsafe manner.

The language of the code sections which Wingfield contends are void as being too vague are the phrases "faulty, careless or negligent manner," "circumstances where injury is likely to result to plants . . . through drift," and "reasonable precautions . . . to confine the material applied substantially" to the intended area. Wingfield contends that the phrases are nowhere defined in the sections themselves or in other parts of the statutory material; that there are no common or trade meanings which have been applied to these phrases which make them more definite; that there is nothing in the context of their use which makes them more definite; that there are no regulations promulgated by the Director which fill the definitional vacancies created by the statutory language.

■ Civil, as well as criminal, statutes must be subjected to a void for vagueness examination. A statute must provide a standard of conduct to be followed and one by which the courts and agencies can measure the conduct after the fact. (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375].)

The evidence is clear that in at least one respect Wingfield's conduct was directly in violation of an express statutory command, that is, that he not discharge spray over property belonging to another without securing permission from the owner or operator of the property. (Cal. Admin. Code, tit. 3, § 2450, subd. (e).) It is also quite apparent that there could be no "void for vagueness" attack on the language of section 2451, subdivision (a) of title 3 of the California Administrative Code which provides that injurious herbicides shall be used only under permit of the agricultural commissioner or under his direct supervision.

■ The basic premise of statutory construction is that the reviewing court must ascertain the intent of the Legislature in order to effectuate the

purpose of the law. (*People* v. *Superior Court* (1969) 70 Cal.2d 123, 132 [74 Cal.Rptr. 294, 449 P.2d 230]; *Mercer* v. *Perez* (1968) 68 Cal.2d 104, 112 [65 Cal.Rptr. 315, 436 P.2d 315].) In compliance with this rule, the intent behind the legislation is determined from the language of the statute read as a whole; if the words of a statute given their ordinary and popular meaning are reasonably free from uncertainty, the courts will look no further to ascertain its meaning. (*Pepper* v. *Board of Directors* (1958) 162 Cal.App.2d 1, 4 [327 P.2d 928]; *People* v. *Moore* (1964) 229 Cal.App.2d 221, 228 [40 Cal.Rptr. 121]; see also *Rowan* v. *City etc. of San Francisco* (1966) 244 Cal.App.2d 308, 314 [53 Cal.Rptr. 88].)

" 'Where a statute contains a reasonably adequate disclosure of the legislative intent regarding an evil to be combatted in language giving fair notice of the practices to be avoided, a court will be slow to say that such a statute is too indefinite to be enforced.' " (*People* v. *Fair* (1967) 254 Cal.App.2d 890, 892 [62 Cal.Rptr. 632].)

In analyzing the legislative intent, it is important to note the nature of the industry which these code sections regulate. As described in *Crop Dusting: Legal Problems in a New Industry,* 6 Stanford Law Review 69: "[C]rop dusting is as dangerous to the farm economy as it is valuable. The same chemical that destroys weeds is equally deadly to such crops as cotton, grapes and tomatoes. The insecticides that kill the boll weevil may also kill livestock and valuable colonies of bees. Science has created weapons which are of inestimable value to many farmers, but which threaten the economic existence of others." In the same article, the herbicide applied in the instant case is described as follows, at pages 70-71: The "beneficial effects of 2,4-D are matched only by its potential for harm. . . . [I]n 1951, 2,4-D was involved in more reports of damage to California crops than any other chemical."

In *Smith* v. *Peterson* (1955) 131 Cal.App.2d 241 [280 P.2d 522, 49 A.L.R.2d 1194], the court stated at page 246: "The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding."

In *McMurtry* v. *State Board of Medical Examiners* (1960) 180 Cal. App.2d 760 at page 767 [4 Cal.Rptr. 910], the court stated: "[I]f the words used may be made reasonably certain by reference to the common law, to the legislative history of the statute involved, *or to the purpose of that statute,* the legislation will be sustained [citations]; and a standard fixed by language which is reasonably certain, judged by the foregoing rules, meets the test of due process 'notwithstanding an element of degree in the definition as to which estimates might differ. [Citations.]' " (Italics added. )

The California Supreme Court has held that a statute is sufficiently certain if it employs words of long usage or with a common law meaning and it is " 'not necessary that it furnish detailed plans and specifications of the acts or conduct prohibited.' " (*Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 60 [216 P.2d 859].)

Each of the terms "faulty," "careless," and "negligent" is an ordinary word commonly understood and used.

The term "negligence" has been defined by the courts numerous times. (See 35 Cal.Jur.2d, Negligence, § 2, p. 486.) " '[N]egligence' signifies and stands for the absence of care." (*Stephenson* v. *Southern Pac. Co.* (1894) 102 Cal. 143, 148 [34 P. 618, 36 P. 407].) " '[N]egligence [is] the failure to observe, for the protection of the interest of another person, that degree of care, precaution, and vigilance which the circumstances justly demand, whereby such other person suffers injury.' " (*Barrett* v. *Southern Pacific Co.* (1891) 91 Cal. 296, 302 [27 P. 666]; *Falls* v. *San Francisco etc. R.R. Co.* (1893) 97 Cal. 114 [31 P. 901].)

The terms "faulty" and "careless" are defined in Webster's Third New International Dictionary by G. & C. Merriam Company:

" 'Careless' . . . 2: not taking ordinary or proper care . . . ."

" 'Faulty' . . . 1 a: marked by fault; having a fault, blemish, or defect; imperfect, unsound . . . (his technique was faulty . . . )."

■ The purpose of the code sections involved is to prevent damage to crops or plants which may be adjacent to fields being treated. A pest control operator is to use reasonable care to avoid drift which would cause damage and to substantially confine the material to the premises being treated so as to avoid damage. Operators are to act in a manner so as to protect crops and vegetation from damage and to do so by confining the material which they are using substantially to the premises being treated. The operator is given sufficiently definite notice as to the proscribed conduct when measured by common understanding and practice and in the light of the potential for harm involved in the use of pesticides by aerial application.

The applicable Agricultural Code and Administrative Code sections as applied to Wingfield are not at all vague but are sufficiently definite and certain to anyone associated with crop dusting or spraying by air. They are designed to protect against the one great evil of the industry, damage to crops not being treated. It would be difficult to conceive of any other language which would do the job.

## The Question of Abuse of Discretion

█ It is a general rule that the propriety of a penalty imposed by an administrative agency is a matter of discretion for the agency and its decision will not be disturbed unless there has been a clear abuse of discretion. (*Martin* v. *Alcoholic Bev. etc. Appeals Bd.* (1959) 52 Cal.2d 287, 291 [341 P.2d 296]; *Hopper* v. *State Personnel Board* (1962) 204 Cal.App.2d 273, 275 [22 Cal.Rptr. 88].)

In addition, it is well established that in determining whether a given penalty is arbitrary, the standard is set by reason and reasonable people. Such a standard, of course, allows for differences of opinion, and a reviewing court may not substitute a decision contrary to that made by the agency, even if such a decision is equally or more reasonable, *if* the determination by the agency is one which *could* have been made by a reasonable person. (*Weiss* v. *State Board of Equalization* (1953) 40 Cal.2d 772, 775 [256 P.2d 1]; *Torres* v. *Dept. of Alcoholic Bev. Control* (1961) 192 Cal.App.2d 541, 544 [13 Cal.Rptr. 531].)

"If reasonable minds might differ as to the propriety of the penalty imposed, this fact serves to fortify the conclusion that the Department acted within the area of its discretion." (*Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1965) 62 Cal.2d 589, 594 [43 Cal.Rptr. 633, 400 P.2d 745].)

█ The use of 2,4-D can and did in this case severely damage plantings adjacent to that being treated. The most careful crop duster cannot predict all variables and may damage a neighboring crop but the record before the Director and before the trial court demonstrated an extremely careless attitude on the part of Wingfield and a lack of real concern for the potential of his operation to cause serious injury to adjoining property. The Director could conclude from the conduct of the petitioner in the two episodes involved that he did not exercise reasonable care to substantially confine pesticides to the property being treated and to avoid drift so as to prevent harm to adjoining property.

The trial court found that the weight of the evidence supported the administrative finding on count I that Wingfield applied the herbicide without first obtaining a permit.

Wingfield testified that he gave no thought to the permit and that as an employee of Delta he was following the instructions of the owner-manager Henderson. He furthermore testified that he never applied for permits and that this was done by his employer. The economic realities are that an employee does not question or argue with an employer over an order such as this. Henderson's testimony is slightly different in that he stated that he told

Wingfield that he was going to get the permit. Actually, Henderson did go into the office of the agricultural commissioner to apply for a permit and was in the office prior to the time that Solari arrived at the Wilson ranch. Henderson testified that he was in the office by 12:15 and Solari has stated in a report which he prepared and filed that his office confirmed this. Solari also testified that he arrived at the Wilson property at about 1 p.m. which would have been some 45 minutes after Henderson called at his office. Solari also testified that there was no reason why he would not have issued the permit. Henderson did testify that he had told Wingfield to apply the 2,4-D when it arrived. Since Wingfield had ample quantities of 2,4-D on the Delta truck at the Wilson ranch available for his use, Henderson's testimony is simply not believable.

The practice in Contra Costa County was not to issue individual permits but to issue a blanket permit for a year. Such a blanket permit was issued to Delta (not to Wingfield) several days after the San Ramon incident but no accusation was made in that case that Wingfield was applying the pesticides without a permit. The practice in Contra Costa County would reenforce the testimony of Wingfield that he did not consider that it was his job to arrange for the permits.

█ On the record in this case, there is no substantial evidence to support a finding that it was Wingfield who violated the applicable code sections in failing to get the permit. Rather, if there was a violation, it was a violation by Henderson, the owner-operator of Delta or by Delta. Placing the responsibility on Wingfield would be similar to requiring a carpenter to be responsible for obtaining a building permit or verifying that his contractor had the appropriate business license. As an employee, Wingfield was entitled to rely on the reasonable representation of his employer that the permit would be taken care of and that he get on with the job.

The finding on count V by the Director was that Wingfield operated in a faulty, careless and negligent manner at San Ramon by flying in an unsafe manner. This count was not related to the method of application of 2,4-D. The hearing officer found that the evidence did not support this accusation. The Director, however, made a finding contrary to the recommendation of the hearing officer.

█ In the finding on count V we do not have a charge of negligent flying tied to crop damage, but a general allegation of flying at an unsafe altitude and in an unsafe manner. The evidence of damage on counts II, III and IV was supported by both expert and lay witnesses. The evidence to support a finding that Wingfield was flying in an unsafe manner near San Ramon is based upon the testimony of lay witnesses who were dis-

turbed by the sound and sight of a low-flying airplane. However, it is obvious that a crop cannot be sprayed in any other way than by a low-flying airplane. It is necessary to fly low in order to try to confine the pesticide to the field being treated. No expert witness, either crop duster or flyer, testified to the manner of flying by Wingfield. While an expert could not have been stationed at San Ramon to observe Wingfield, he could at least have testified to safe flying practices under the circumstances and as related to the eyewitness testimony. There is no substantial evidence to warrant a finding that Wingfield was flying at an unsafe altitude or in an unsafe manner.

Even though the evidence does not support the findings on count I and count V, there can be no serious question that the weight of the evidence supports the findings on counts II, III and IV relating to the application of pesticides in both San Joaquin and Contra Costa Counties.

■ Although the determination of penalty lies with the administrative agency and not the court, there is an exception where the court finds some of the charges unsupported by the evidence and cannot ascertain whether the same penalty would have been imposed had the agency recognized that fact. Under such circumstances the case should be remanded to the agency for reconsideration of the penalty. (*Tushner* v. *Savage* (1963) 219 Cal.App. 2d 71, 82 [33 Cal.Rptr. 247]; *Doyle* v. *Board of Barber Examiners* (1966) 244 Cal.App.2d 521, 526 [53 Cal.Rptr. 420].)

The judgment of the trial court denying a writ of mandate is reversed. The case is remanded to the trial court with directions to remand the case to the Director for the purpose of reconsideration of the penalty previously imposed.

Richardson, P. J., and Friedman, J., concurred.

A petition for a rehearing was denied January 3, 1973, and the opinion was modified to read as printed above.