[Civ. No. 14010. Third Dist. Dec. 24, 1974.]

SAN JUAN TEACHERS ASSOCIATION et al.,
Plaintiffs and Respondents, v.
SAN JUAN UNIFIED SCHOOL DISTRICT,
Defendant and Appellant.

[Civ. No. 13924. Third Dist. Dec. 24, 1974.]

YUBA CITY UNIFIED EDUCATION ASSOCIATION et al.,
Plaintiffs and Respondents, v.
BOARD OF TRUSTEES OF THE YUBA CITY
UNIFIED SCHOOL DISTRICT, Defendant and Appellant.

234

## Counsel

John B. Heinrich, County Counsel, and Robert Galgani, Deputy County Counsel, for Defendant and Appellant in Civ. No. 14010.

Edward F. Buckner, County Counsel, Marianne Heenan, Deputy County Counsel, and Keith Breon for Defendant and Appellant in Civ. No. 13924.

Robert G. Walters as Amici Curiae on behalf of Defendant and Appellant in No. 13924.

Karlton, Blease & Vanderlaan, Lawrence K. Karlton and Coleman A. Blease for Plaintiffs and Respondents.

## Opinion

**JANES, J.**—These appeals, consolidated for decision, involve separate disputes as to the scope of a public school employer's obligation to "meet and confer" with representatives of certificated employee organizations under the provisions of the Winton Act (Ed. Code, § 13080 et seq.).[1]

---

[1] All citations of code sections herein will refer to the Education Code unless otherwise indicated.

In each case, upon the complaint of a teachers' association and the chairman of the certificated employee council which represented that organization,[2] the superior court tried the cause without a jury and granted declaratory relief generally adverse to the contentions of the teachers' employer, the defendant school district. Additionally, in the action against the Yuba City Unified School District, the judgment permanently enjoined the district's board of trustees from conduct inconsistent with the court's declaration of rights. Each school district appeals from the judgment against it.

## WINTON ACT

To facilitate comprehension of the facts relevant to each appeal, we quote those portions of the Winton Act upon which the rights of the parties depend:[3]

"It is the purpose of this article [the Winton Act] to promote the improvement of personnel management and employer-employee relations within the public school systems in the State of California by providing a uniform basis for recognizing the right of public school employees to join organizations of their own choice and be represented by such organizations in their professional and employment relationships with public school employers and to afford certificated employees a voice in the formulation of educational policy. Nothing contained herein shall be deemed to supersede other provisions of this code and the rules and regulations of public school employers which establish and regulate tenure or a merit or civil service system or which provide for other methods of administering employer-employee relations. This article is intended, instead, to strengthen tenure, merit, civil service and other methods of administering employer-employee relations through the establishment of uniform and orderly methods of communication between employees and the public school employers by which they are employed. . . ." (§ 13080.)

[2]The certificated employee council is the body designated by section 13085 to meet and confer with the school district's governing board in any district where there is more than one certificated employee organization (e.g., teachers' association). The certificated employee council is composed of representatives of qualifying employee organizations.

[3]Since these are appeals from the granting of declaratory and injunctive relief, we look to the current language of relevant provisions of the Winton Act (Stats. 1965, ch. 2041, as amended by Stats. 1970, chs. 1412, 1413, and by Stats. 1971, ch. 438). (*Callie* v. *Board of Supervisors* (1969) 1 Cal.App.3d 13, 18-19 [81 Cal.Rptr. 440]; *Brophy* v. *Employees Retirement System* (1945) 71 Cal.App.2d 455, 459-460 [162 P.2d 939].) The same amendments were in force at the time of the judgments. Other amendments of the Winton Act involve provisions which are not here in issue.

"Employee organizations shall have the right to represent their members in their employment relations with public school employers . . . ." (§ 13083.) "The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to wages, hours and other terms and conditions of employment." (§ 13084.)

"A public school employer, or such representatives as it may designate . . . , shall meet and confer with representatives of certificated and classified employee[4] organizations upon request with regard to *all matters relating to employment conditions and employer-employee relations,* and in addition, shall meet and confer with representatives of employee organizations representing certificated employees upon request with regard to procedures[5] relating to the definition of educational objectives, the determination of the content of courses and curricula, the selection of textbooks, and other aspects of the instructional program to the extent such matters are within the discretion of the public school employer or governing board under the law. . . ." (§ 13085.) (Italics added.)

" 'Meet and confer' means that a public school employer, or such representatives as it may designate, and representatives of employee organizations shall have the mutual obligation to exchange freely information, opinions, and proposals; and to make and consider recommendations under orderly procedures in a conscientious effort to reach agreement by written resolution, regulation, or policy of the governing board effectuating such recommendations." (§ 13081, subd. (d).)

"A public school employer shall meet and confer with representatives of employee organizations or the certificated employee council pursuant

[4]"Classified employees of school districts are all employees other than those required to hold a state certificate or credential. Certificated employees of school districts are those employees required to hold a state certificate or credential and include teachers, supervisory personnel, and administrators." (Comment, *California's Alternative to Collective Bargaining for Teachers: The Winton Act, 1965-1974, and Proposals for Change* (1974) 5 Pacific L.J. 698, 701, fn. 16.)

[5]Both school districts at bench stress the fact that the Statutes of 1970 (chs. 1412, 1413) substituted the word "procedures" for the words "all matters" in section 13085 immediately preceding the phrase "relating to the definition of educational objectives . . . ." As will subsequently appear herein, the amendment does not control our disposition of these appeals since the change affected a portion of section 13085 which does not embrace the matters claimed by plaintiffs to be within the "meet and confer" process. The 1970 amendment of section 13085 did not alter the phrase "all matters relating to employment conditions and employer-employee relations. . . ," *which is the governing phrase on these appeals.*

to Section 13085 with regard to a procedure for the resolution of persistent disagreements which may include factfinding and shall adopt rules and regulations establishing such a procedure, which procedure shall be mutually acceptable to the parties meeting and conferring. In the event the parties cannot agree on a procedure for the resolution of persistent disagreements, the parties, at the request of one of them, shall refer any persistent disagreement to a committee of three persons, one selected by the school employer, one selected by the employee organization or the certificated employee council, as the case may be, and in turn those persons shall select the third member. The committee shall report its findings to the parties at a public meeting of the parties. The committee may report recommendations to the parties at a public meeting upon the prior written agreement of both parties. Such findings and recommendations shall not be binding on the parties." (§ 13087.1.)

" 'Persistent disagreement' means a disagreement between the parties to meeting and conferring required by this article that has not been resolved to the mutual satisfaction of the parties through such meeting and conferring within a reasonable period of time after the initial presentation of proposals, which shall be not less than 30 days, except by mutual consent." (§ 13081, subd. (e).)

"A public school employer shall adopt reasonable rules and regulations for the administration of employer-employee relations under this article. [¶] . . . [S]uch rules may include provisions for . . . such other matters as are necessary to carry out the purposes of this article." (§ 13087.)

"The enactment of this article shall not be construed as making the provisions of Section 923 of the Labor Code[6] applicable to public school employees and shall not be construed as prohibiting a public school employer from making the final decision with regard to all matters specified under Section 13085." (§ 13088.)

---

[6]Labor Code section 923 "guarantees to those employed by a private business purely local in nature and which does not 'affect commerce' within the meaning of the National Labor Relations Act [29 U.S.C. § 151 et seq.], that there shall be no interference or restraint by the employer on rights of the workers, and guarantees to [such] private employees the right to organize, to engage in collective bargaining [citation], and to participate in concerted activities to secure legitimate employment benefits." (*California Federation of Teachers* v. *Oxnard Elementary Sch.* (1969) 272 Cal.App.2d 514, 521 [77 Cal.Rptr. 497].)

SAN JUAN CASE
(3 Civil No. 14010)

1. *Facts in San Juan Case*

In May 1971, the San Juan Teachers Association ("Association"), represented by a certificated employee council ("CEC"), proposed to the governing board ("Board") of the San Juan Unified School District ("District") a master agreement for the 1971-1972 school year. The proposed agreement was prefaced by certain "Governing Clauses" which applied to all of its provisions. The Governing Clauses were as follows:

"1. The Board of Education of the San Juan Unified School District recognizes the Certificated Employees Council as the exclusive representative of all verified certificated employee organizations within the San Juan Unified School District.

"2. The San Juan Teachers Association recognizes that the Board of Education has the responsibility and authority to manage and direct, on behalf of the public, all the operations and activities of the San Juan Unified School District to the full extent authorized by law; *provided that such responsibility and authority shall be exercised by the Board in conformity with the provisions of this Agreement.*

"3. The Board of Education hereby declares its intent to *maintain* the agreements reached, on the various items in this Master Agreement, as district policy for a period of *one year* from their date of adoption by the Board of Education.

"4. The members of the San Juan Teachers Association hereby declare their intent to provide their professional services within their individual areas of competence, in accordance with this Agreement and with other adopted District Policies and the laws of the State of California.

"5. Amendments, changes, modifications or other alterations of the terms of this Master Agreement, after its adoption by the Board of Education *and its ratification by the Association,* may be *proposed* by the Board or the Association in order to meet emergencies, to comply with statutory provisions, or to effect other changes deemed important to initiate during the term of this Agreement.

"6. No amendments, changes, modifications or other alterations of the terms of this Master Agreement may be made by an administrative officer of the District or by a representative of the Association; except that such officer or representative may bring to the attention of the Board of Education and the Certificated Employees Council the apparent need for change of a portion of this Agreement.

"7. As a result of meetings held between the designated representative of the Board of Education and the San Juan Certificated Employees Council, it has been *agreed* that the foregoing clauses and the attached Master Agreement be submitted to the San Juan Board of Education *for adoption* in accordance with Education Code Sections 13080-13090 [the Winton Act] and District Policy No. 4116.2 [Board rules and regulations to be discussed *infra*]." (Italics added.)

The CEC requested the Board's representative to meet and confer on the proposed Governing Clauses, but the Board refused to permit its representative to do so and informed the CEC that the Board would not agree to the clauses. To resolve this issue, the CEC requested that use be made of the procedures set forth in section 13087.1 for the resolution of persistent disagreements. The Board, however, declined to participate in such procedures.

Among the provisions of the proposed master agreement was one for the creation and staffing of a counseling program in the District's intermediate schools (seventh and eighth grades) to furnish guidance on an individualized basis to students who presented educational or disciplinary problems. The Association, through the CEC, originally proposed that the program be handled by full-time counselors who possessed a counseling credential and had successfully completed 30 units of counseling studies, and who would be selected by the faculty and administrators of the schools they served.

However, at a Board meeting on August 31, 1971, the Board adopted a "teacher-adviser" program in which teachers were to act as part-time teachers and part-time counselors and need not have obtained their counseling credential, although they were at least to be working toward it. Under the teacher-adviser program, school faculties were to have no role in the selection of counselors. The Board made its decision on August 31 notwithstanding the fact that, at the same meeting, the CEC had proposed that the staffs of individual schools be given the option of using either the teacher-adviser program or the full-time counselor

program, and had requested that the matter be the subject of meeting and conferring.

Eighteen months earlier (on February 20, 1970), the Board had reissued certain rules and regulations which had been previously adopted by it to govern its relations with certificated employees. Those rules and regulations included a restatement of "rights . . . specified for certificated employees by Education Code, sections 13080 to 13088. . . ." One of those rights, as described in the rules and regulations, was as follows: "The scope of representation by certificated employee organizations includes all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment and *all matters* relating to the definition of educational objectives, the determination of the content of courses and curricula, the selection of textbooks and other aspects of the instructional program to the extent such matters are within the discretion of the Board of Education." (Italics added.)

It is self-evident that the Board arrived at this definition of "the scope of representation" by construing sections 13084 and 13085 as a whole in accordance with settled rules of statutory construction.[7] At the time the Board reissued the rules and regulations, section 13085 as first enacted was still in force and included "all matters relating to the definition of educational objectives [etc.]" within the "meet and confer" process insofar as certificated employees were concerned. (Stats. 1965, ch. 2041.) Subsequently, by an amendment of section 13085 effective November 23, 1970, the Statutes of 1970 (chs. 1412, 1413) substituted "procedures" for "all matters" before the phrase "relating to the definition of educational objectives . . . ." However, by the time of all the events above described, the Board had not yet changed its rules and regulations to make its definition of "the scope of representation" conform with section 13085 as amended.[8]

Having been rebuffed in their attempts to subject the Governing Clauses and the counselor program to the "meet and confer" process, the Association and the chairman of the CEC sued the District for injunctive and declaratory relief. On October 1, 1971, the trial court granted a preliminary injunction which required the District, in its implementation of a part-time counseling program, "to employ only those people who have the basic credential with at least six units of counselling training

---

[7]See, 45 Cal.Jur.2d, Statutes, section 117, pages 626-627.

[8]Nor had the Board made such change by the time of trial.

and absolutely and emphatically guarantee they will go forward with their full credential"—limitations which were satisfactory to the Board. No appeal was taken from that order. Subsequently, at the trial of the declaratory relief issues in April 1972, the plaintiffs in the San Juan case made no attempt to obtain a permanent injunction; and the judgment against the San Juan Unified School District is silent as to injunctive relief.[9]

## 2. Judgment and Contentions in San Juan Case

The declaratory judgment held, inter alia, as follows: "While only the Board may decide in the first instance whether or not there will be an intermediate school counselling program, once that determination has been made, *all* matters relating to the implementation of the program, including the qualifications of the personnel to be used in the program, are within the scope of representation of the Winton Act." (Italics in original.)

 Although satisfied with the trial court's prefatory declaration which reserved to the Board the sole power to decide whether there would be a counseling program,[10] the District contends that the court erred when it further held that the scope of representation (inferentially, of certificated employees) extends to "all matters relating to the implementation of the program, including the qualifications of the personnel to be used in the program. . . ." We reject the District's contention.

"It is a cardinal rule of construction that the several parts of a statute must be read together and harmonized, when reasonably possible, so as to discover and give effect to the intent of the Legislature." (*Ingram* v. *Justice Court* (1968) 69 Cal.2d 832, 839 [73 Cal.Rptr. 410, 447 P.2d 650, 36 A.L.R.3d 1391].) "[T]he intent behind the legislation is determined from the language of the statute read as a whole . . . ." (*Wingfield* v. *Fielder* (1972) 29 Cal.App.3d 209, 219 [105 Cal.Rptr. 619].) Moreover, "courts should give effect to statutes 'according to the usual, ordinary

[9]See, 2 Witkin, California Procedure (2d ed. 1970) Provisional Remedies, sections 47-48, pages 1496-1497, and section 106, page 1536.

[10]In plaintiffs' brief, the Association and the chairman of the CEC ask us to expand upon the trial court's declaration that "only the Board may decide in the first instance whether or not there will be an intermediate school counselling program. . . ." We decline to order such modification, since the declaration is correct so far as it goes (§ 13088) and plaintiffs did not appeal from the judgment (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 216-217, pp. 4206-4208).

import of the language employed in framing them.' " (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33].) "[I]f the words of a statute given their ordinary and popular meaning are reasonably free from uncertainty, the courts will look no further to ascertain its meaning." (*Wingfield* v. *Fielder, supra,* at p. 219.)

■ In section 13084, the Winton Act generally defines the scope of representation; and in section 13085 the act defines the scope of representation in the context of the "meet and confer" process. *Insofar as here pertinent* (see fn. 5, *supra*), both sections use the same broad definition—namely, "all matters relating to employment conditions and employer-employee relations . . . ." (See also § 13087.1.) The mere fact that section 13084 declares that such "matters" include but are not limited to "wages, hours and other terms and conditions of employment" in no way suggests that the scope of representation for purposes of section 13085 has a more restricted meaning.

When sections 13084 and 13085 are read together with section 13080, as applied to certificated employees, the only reasonable construction is that the formulation of educational policy is a matter relating to employment conditions and employer-employee relations, for section 13080 expressly states that one of the very purposes of the Winton Act is "to afford certificated employees a voice in the formulation of educational policy." (See *Grasko* v. *Los Angeles City Board of Education* (1973) 31 Cal.App.3d 290, 302 [107 Cal.Rptr. 334]; *Torrance Education Assn.* v. *Board of Education* (1971) 21 Cal.App.3d 589, 593 [98 Cal.Rptr. 639]; *California Federation of Teachers* v. *Oxnard Elementary Sch.* (1969) 272 Cal.App.2d 514, 533, 539 [77 Cal.Rptr. 497].)

■ When the Legislature amended section 13085 by substituting "procedures" for "all matters" before the phrase "relating to the definition of educational *objectives*" (Stats. 1970, chs. 1412, 1413)—a phrase not determinative of these appeals (see fn. 5, *supra*)—it did not amend the declaration in section 13080 that a purpose of the Winton Act is "to afford certificated employees a voice in the formulation of educational *policy.*" (Italics added.) We therefore conclude that "educational policy" was intended by the Legislature to have a more pervasive meaning than "educational objectives," especially since the latter phrase is used in section 13085 in association with "the determination of the content of courses and curricula, the selection of textbooks, and *other aspects of the instructional program* . . . ." (Italics added.) (See, *Torrance*

*Education Assn.* v. *Board of Education, supra,* 21 Cal.App.3d at p. 593; *California Federation of Teachers* v. *Oxnard Elementary Sch., supra,* 272 Cal.App.2d at p. 533.)

█ We emphasize that the act only gives such employees "a voice" by which they may express themselves on subjects of meeting and conferring; section 13088 reserves to the public school employer the power of final decision.

█ Thus, upon a literal and *integrated* construction of sections 13080, 13084, and 13085, it is manifest that all matters relating to the implementation of the counseling program—including qualification criteria for, and selection of, the counselors themselves (except as section 1070 prescribing qualifications may be applicable)—are necessarily included within the inherently broad scope of "all matters relating to employment conditions and employer-employee relations" (§§ 13084, 13085). Implementation of the program not only involves determinations of educational policy (e.g., full-time versus part-time counselors) but also will affect the employment conditions of the general teaching staff by removing problem students from the classroom for temporary special-ized guidance. Indeed, here as in the trial court, the District has conceded that the teacher-adviser program has an impact upon the working conditions of teachers because it involves a shift from full-time teaching to part-time teaching and part-time counseling, and it requires that other teachers pick up the teaching load being dropped by the teacher-counselors.[11]

█ We recognize, of course, that "[t]he literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to

[11]Under the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.)—which applies to public employees not covered, as are public school employees, by specific legisla-tion—the size of caseloads assigned to social workers is within the scope of the requirement that public employers meet and confer with representatives of employee organizations regarding "wages, hours, and other terms and conditions of employment" (Gov. Code, § 3505). (*Los Angeles County Employees Assn., Local 660* v. *County of Los Angeles* (1973) 33 Cal.App.3d 1, 4-5 [108 Cal.Rptr. 625].)

The phrase "wages, hours, and other terms and conditions of employment" in the Meyers-Milias-Brown Act is taken verbatim from a provision in the federal Labor Management Relations Act (29 U.S.C. § 141 et seq.) defining the scope of mandatory collective bargaining (29 U.S.C. § 158, subd. (d)). The federal definition " ' . . . has been given a generous interpretation, including almost anything that might affect an employee in his employment relationship.' " (*Social Workers' Union, Local 535* v. *Alameda County Welfare Dept.* (1974) 11 Cal.3d 382, 391 [113 Cal.Rptr. 461, 521 P.2d 453].) It includes employee work loads. (*Gallenkamp Stores Co.* v. *N.L.R.B.* (9th Cir. 1968) 402 F.2d 525, 529, fn. 4; accord, *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 619-620 [116 Cal.Rptr. 507, 526 P.2d 971].)

manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole." (*Silver* v. *Brown* (1966) 63 Cal.2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689].) However, nothing in the history of the Winton Act[12] indicates that the Legislature failed to appreciate the sweeping import of the phrase "all matters relating to" in sections 13084 and 13085—giving those words their ordinary meaning.

To the contrary, since public school teachers in California have no right to bargain collectively or to strike (*Grasko* v. *Los Angeles City Board of Education, supra,* 31 Cal.App.3d at p. 302; *Los Angeles Unified School Dist.* v. *United Teachers* (1972) 24 Cal.App.3d 142 [100 Cal.Rptr. 806]; *California Federation of Teachers* v. *Oxnard Elementary Sch., supra,* 272 Cal.App.2d at pp. 521, 523; *Berkeley Teachers Assn.* v. *Board of Education* (1967) 254 Cal.App.2d 660, 671 [62 Cal.Rptr. 515]; see *Almond* v. *County of Sacramento* (1969) 276 Cal.App.2d 32, 35-36 [80 Cal.Rptr. 518]), it is reasonable to conclude that the Winton Act represents a legislative attempt not to end but to compensate for those disabilities, thus pacifying certificated employees (*California Federation of Teachers* v. *Oxnard Elementary Sch., supra,* at pp. 521-522, 539-540), by granting such employees a broad scope of representation in "recognition that school teachers, because of their expertise and dedication to the welfare of the schools and their pupils, are particularly well suited to make a constructive contribution to the formulation of [educational] policy" (*Grasko* v. *Los Angeles City Board of Education, supra,* at p. 302; see also *California Federation of Teachers* v. *Oxnard Elementary Sch., supra,* at pp. 531-533).

" 'Teachers are earnest and devoted people with a high degree of professional training and experience. They know children and what goes on in the classroom and in the learning process. A lay board should make full use of their willingness, and their knowledge and experience in matters of vital concern to both. Their voices should be heard and their recommendations thoughtfully considered. This should be rudimentary in good procedure. If boards and superintendents aren't doing this, they should. . . .' " (*California Federation of Teachers* v. *Oxnard Elementary Sch., supra,* 272 Cal.App.2d at p. 539.)

---

[12]The legislative history and reasons for enactment of the Winton Act are comprehensively discussed in *Berkeley Teachers Assn.* v. *Board of Education* (1967) 254 Cal.App.2d 660, at pages 663-664 [62 Cal.Rptr. 515], *California Federation of Teachers* v. *Oxnard Elementary Sch., supra,* 272 Cal.App.2d at pages 520-524, 529-533, *Westminster Sch. Dist.* v. *Superior Court* (1972) 28 Cal.App.3d 120, at pages 127-129 [104 Cal.Rptr. 388], and *Grasko* v. *Los Angeles City Board of Education, supra,* 31 Cal.App.3d at pages 301-304. California's experience under the act is summarized in the law review comment cited in footnote 4, *supra* (5 Pacific L.J. 698, 707-712).

■ Based upon the Board's aforementioned failure to change its rules and regulations to conform with the 1970 amendment of section 13085, the trial court made as paragraph No. 2 of its declaratory judgment the following holding: "The Board may, and here did, expand the mandatory scope of representation by its Policies and Procedures [i.e., rules and regulations], the Winton Act providing only broad guidelines. (See *Sacramento County Employees Organization, Local 22, etc. Union* v. *County of Sacramento* (1972) 28 Cal.App.3d 424, 430.)" (Citation in original.) The court also declared, as paragraph No. 5 of the judgment, that "[t]he Board may adopt policies and procedures which bind it to meet and confer upon all matters in respect to which the Board has discretion to act."

The District contends that the holdings in paragraphs No. 2 and No. 5 of the judgment are erroneous. We agree. Quite apart from our conclusion that the Board's mere failure to amend its rules and regulations was not substantial evidence that it intended to expand the mandatory scope of representation (see *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]), we are of the opinion that, as a matter of law, the Board has no power to expand the scope of representation delineated by the Winton Act.

"A school district is an agency of limited authority; it may exercise only those powers granted by statute." (*Yreka etc. School Dist.* v. *Siskiyou etc. School Dist.* (1964) 227 Cal.App.2d 666, 670 [39 Cal.Rptr. 112].) "A governing board of a school district has no authority to enact a rule or regulation which alters or enlarges the terms of a legislative enactment." (*Renken* v. *Compton City School Dist.* (1962) 207 Cal.App.2d 106, 114 [24 Cal.Rptr. 347]; see also *Grasko* v. *Los Angeles City Board of Education, supra,* 31 Cal.App.3d at pp. 300-301; *Berkeley Teachers Assn.* v. *Board of Education, supra,* 254 Cal.App.2d at pp. 672-673.)

The Winton Act is an innovative statute (*Grasko* v. *Los Angeles City Board of Education, supra,* 31 Cal.App.3d at pp. 301-302, 306; *Westminster Sch. Dist.* v. *Superior Court* (1972) 28 Cal.App.3d 120, 127, 129 [104 Cal.Rptr. 388]; *California Federation of Teachers* v. *Oxnard Elementary Sch., supra,* 272 Cal.App.2d at pp. 523, 535, 539-540) which itself defines the scope of representation applicable to public school employees (§§ 13080, 13084, 13085, 13087.1). "[A]ffirmative expressions in a statute introducing a new rule imply a negative of all not within their purview." (*Johnston* v. *Baker* (1914) 167 Cal. 260, 264 [139 P. 86]; see *Brintle* v. *Board of Education* (1941) 43 Cal.App.2d 84, 87 [110 P.2d 440].)

Moreover, "where uncertainty exists [as to the meaning of a statute,] consideration may be given to the consequences that will flow from a particular interpretation." (*Jaynes* v. *Stockton* (1961) 193 Cal.App.2d 47, 56 [14 Cal.Rptr. 49].) "The public schools of this state are a matter of statewide rather than local or municipal concern . . . ." (*Hall* v. *City of Taft* (1956) 47 Cal.2d 177, 179 [302 P.2d 574].) One of the express purposes of the Winton Act is to provide "a *uniform* basis for recognizing the right of public school employees to . . . be represented . . . in their professional and employment relationships with public school employers . . . ." (§ 13080.) (Italics added.) Such uniformity would be nonexistent throughout the state if school districts were free to expand or not to expand the mandatory scope of representation, as they saw fit. The very lack of uniformity would be productive of unrest on the part of those public school employees whose scope of representation had not been expanded by their employers.

In holding that the Board can expand the mandatory scope of representation, the trial court erroneously relied upon *Sacramento County Employees Organization, Local 22 etc. Union* v. *County of Sacramento, supra,* 28 Cal.App.3d 424 [104 Cal.Rptr. 619]. That case arose under the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.; see fn. 11, *supra*). Just as the Winton Act authorizes a public school employer to adopt rules which "may include provisions for . . . such other matters as are necessary to carry out the purposes of [the act]" (§ 13087), the Meyers-Milias-Brown Act permits other public agencies to adopt rules which "may include provisions for . . . such other matters as are necessary to carry out the purposes of [the latter act]" (Gov. Code, § 3507). However, in the *Sacramento County Employees Organization* case, the determination of the appellate court that the county could authorize the payroll deduction of dues (and could limit such deductions to members of recognized employee organizations) was based upon the failure of the Meyers-Milias-Brown Act to mention the subject of dues, as well as upon other statutes which expressly allowed but did not require public agencies to approve dues deductions (Gov. Code, §§ 1157.1, 1157.3). (28 Cal.App.3d at pp. 430-431.) In contrast, the Winton Act is not silent as to the scope of representation, but defines and describes it. (§§ 13080, 13084, 13085, 13087.1.)

The District next attacks the declaration in paragraph No. 3 of the judgment that "[t]he Board may not act unilaterally with respect to a matter under negotiation." We reject the District's broad contention that the Board may, *under any circumstances,* act unilaterally on a matter as to

which the Board and the CEC are then meeting and conferring. It is self-evident that the latter contention would be destructive of the "meet and confer" process and contrary to the purposes of the Winton Act.

By the same token, however, paragraph No. 3 of the judgment is overly broad in that its effect is to prohibit the Board from acting unilaterally on a current "meet and confer" item regardless of the circumstances, which might even be of an emergency nature. The Legislature, by defining "meet and confer" in section 13081, subdivision (d), has provided the accommodation necessary to resolve this issue. Accordingly, we hold that a public school employer may not act unilaterally with respect to a matter as to which the employer is then meeting and conferring with representatives of employee organizations under section 13085 unless the employer has complied with section 13081, subdivision (d), or a bona fide emergency compels such unilateral action.

■ The District also ascribes error to paragraph No. 4 of the judgment, which declared as follows: "The Board may, but is not required to, enter into a legally binding agreement relating to wages, hours and other working conditions, including the so-called 'governing clauses.' The Board, however, is required to meet and confer in a conscientious effort to reach agreement on such matters." The District's contention in this regard is meritorious.

"The Winton Act does not embody the concept of collective bargaining. [Citations.] Its provisions make clear that the right conferred upon certificated public school employees is to voice their views and ideas through recognized representatives and to have these views and ideas considered by the public school employer but that all final decisions are left to the public school employer. (§§ 13085, 13088.)" (*Westminster Sch. Dist.* v. *Superior Court, supra,* 28 Cal.App.3d at p. 128.) "[T]here is no statutory requirement that the employer 'negotiate' in the sense of striving to reach a contract, bargain or agreement. Rather, the statutory obligation of the employer is expressed in the words 'meet and confer.' " (*Torrance Education Assn.* v. *Board of Education, supra,* 21 Cal.App.3d at p. 593.)

Although the duty to "meet and confer" requires "a conscientious effort to reach agreement,"[13] such agreement must be effected "by

[13]The Meyers-Milias-Brown Act (fn. 11, *supra*) requires public employers to "meet and confer in good faith" with representatives of recognized employee organizations;

written resolution, regulation, or policy *of the governing board . . . .*" (§ 13081, subd. (d).) (Italics added.) In *Grasko* v. *Los Angeles City Board of Education, supra,* 31 Cal.App.3d at pages 303-304, the court held that the legislative history of the Winton Act compels the conclusion that the governing board's resolutions, regulations, and policies "must be subject to change at the board's pleasure" inasmuch as "the Legislature has determined that binding written contracts or agreements have no place in the field of labor relations between a public school employer and its employees." Accordingly, the court ruled that California school districts and their governing boards are not authorized to enter into binding agreements with representatives of their employees regarding matters of employment conditions or educational policy. (*Id.* at p. 300.)

The Governing Clauses proposed in the case at bench were, on their face, a thinly veiled attempt by the Association and CEC to convert the Winton Act into a vehicle for collective bargaining and to effect a binding contract of the type proscribed in *Grasko.* Hence, while the Board is required to meet and confer with the CEC upon request in a conscientious effort to "reach agreement" (as defined by section 13081, subdivision (d)) on matters within the scope of representation, the Board is not required to meet and confer with the CEC concerning the Governing Clauses or any other proposed binding agreement relating to such matters.

■ Lastly, the District argues that a school board is not required to meet and confer upon request to determine whether the matter involved falls within the scope of representation. Although the declaratory judgment did not address itself to that issue, the trial court found that there was "an actual present controversy between the parties" concerning it. The question being one of law, this opinion will serve as an adequate declaration as to its proper resolution. (See *Torrance Education Assn.* v. *Board of Education, supra,* 21 Cal.App.3d at p. 595.)

We reject the District's contention. We do not think that the Legislature intended to make the Winton Act a source of premature litigation in cases where neither statute nor case law had answered the question whether a particular subject fell within the mandatory scope of representation, as broadly defined and described in the Winton Act.

---

and the act defines that obligation as including the duty "to exchange freely information, opinions, and proposals, and to endeavor to reach agreement" (Gov. Code, § 3505)—a duty identical to that prescribed by the Winton Act's definition of "meet and confer" (§ 13081, subd. (d)). Under the Meyers-Milias-Brown Act, "the employer is required to make counter-proposals" (*East Bay Mun. Employees Union* v. *County of Alameda* (1970) 3 Cal.App.3d 578, 584, fn. 10 [83 Cal.Rptr. 503]), but any agreement reached after meeting and conferring "shall not be binding" on the employer (Gov. Code, § 3505.1).

Acceptance of the District's argument would proliferate requests for judicial intervention without benefit of the more adequate administrative record, bearing on the merits of that question, which would result from "meet and confer" sessions devoted to its resolution.

The "meet and confer" process is intended by the Legislature to serve as a "method[ ] of communication between employees and the public school employers by which they are employed" (§ 13080) so as to "promote the improvement of . . . employer-employee relations" (*ibid.*). The "meet and confer" process, therefore, is an instrument of employer-employee relations; and, in cases where there is a question whether a specific topic must be explored by that process, such questions are clearly "matters *relating* to . . . employer-employee relations" (§§ 13084, 13085) and are themselves subject to meeting and conferring upon request. (Italics added.)

Our views in this last respect in no way conflict with our holding that a school district is powerless to expand the scope of representation delineated by the Winton Act. No agreement of the parties, reached after meeting and conferring, can effectively bring a matter within the scope of representation if it has no lawful place there.

YUBA CITY CASE
(3 Civil No. 13924)

1. *Facts in Yuba City Case*

During several "meet and confer" sessions prior to December 15, 1970, the Yuba City Unified Education Association ("Association"), represented by a certificated employee council ("CEC"), proposed to the governing board ("Board") of the Yuba City Unified School District ("District") a permanent salary schedule increase for teachers employed by the District. At those meetings the CEC and the Board's representatives discussed sources of money available for teacher salary increases and areas of the budget that could be cut to provide for such increases.

The Board's only counteroffer came on December 15, 1970, when, through its representatives, the Board proposed a one-year-only (1970-1971) salary adjustment of $135,000 to be divided among all certificated personnel, including administrators as well as teachers. The Board asserted at that time that its counterproposal was a "first, last and final offer." The Association, however, declined to accept it.

On December 21, 1970, at a meeting of the Board, the chairman of the CEC declared that there was a persistent disagreement between the CEC and the Board, and asked for the establishment of a fact-finding committee pursuant to the provisions of section 13087.1. Such a committee was established; it met and thereafter submitted a unanimous report, dated February 10, 1971, to the Board. The report made findings of fact that additional monies would probably be forthcoming to the District over and above the amounts anticipated by the Board in offering a salary adjustment of $135,000.

Subsequently, the chairman of the CEC requested the Board to meet and confer regarding the 1970-1971 salary adjustment based upon the findings of the fact-finding committee. The Board was willing to voluntarily "discuss" that subject; but, on the ground that the Winton Act did not require it, the Board refused to recognize any legal obligation to meet and confer on teachers' salaries based upon the committee's findings. Instead, the Board's representatives proposed to the CEC two alternative methods of allocating to certificated personnel, as a one-year salary adjustment for 1970-1971, a sum greater than $135,000 but not inclusive of all additional funds anticipated by the fact-finding committee. Because of the refusal of the Board to meet and confer on the basis of the committee's report, and lacking any other alternative, the Association accepted one of the two alternatives proposed by the Board. The Board thereafter adjusted teachers' salaries for 1970-1971 accordingly.

During the period from July 1971 to June 1972, the CEC requested the Board to meet and confer on budget and spending priorities in relation to teachers' salary increases, on the use and availability for such increases of specified revenues and monies which the Board had discretion to appropriate for that purpose, and on the inhibiting effect upon such increases of expenditures for other purposes from the District's undistributed reserve. The CEC also requested the Board to meet and confer on those items prior to appropriating, for other uses, funds which the Board had discretion to expend for teachers' salary increases.

The Board refused those requests. The Board contended that the "meet and confer" requirements of the Winton Act did not extend to the items specified by the CEC, and that, although the Board would honor its statutory obligation to meet and confer on teachers' salaries per se, it would only "discuss" on a voluntary basis (rather than under statutory

compulsion) the items concerning revenue availability, budget and spending priorities, and use of the undistributed reserve. Accordingly, on numerous occasions during the last half of 1971 and first half of 1972, the CEC and the Board's representatives met and conferred on teachers' salary increases, but only "discussed" the other related fiscal items. During this period, the Board adopted the budget for 1971-1972 and authorized expenditures for other purposes of funds which it had discretion to appropriate for teachers' salary increases; and the Board did so even though no emergency existed and the CEC had requested the Board to defer action until the priority of those expenditures in relation to such increases had been explored at "meet and confer" sessions.

In the spring of 1972, the Board refused to meet and confer upon the basis of the report of a fact-finding committee established after a persistent disagreement had been declared by the CEC with respect to teachers' salary increases for the 1971-1972 school year. Instead, the Board granted the certificated employees another salary adjustment by using for that purpose a smaller portion of the undistributed reserve than the CEC had proposed.

### 2. *Judgment and Contentions in Yuba City Case*

Paragraph No. 2 of the declaratory portion of the judgment held as follows: "The Winton Act, in Education Code § 13087.1, establishes a procedure for findings and recommendations by a committee established to consider the resolution of any persistent disagreement between a public school employer and the employee representative. Section 13087.1 contemplates that the findings and recommendations shall be the basis for the narrowing or resolution of the matters in dispute. The Winton Act accordingly requires that the parties meet and confer upon request with respect to the findings and recommendations of a committee formed pursuant to § 13087.1."

Inasmuch as section 13087.1 provides that the findings and recommendations of a committee established under it "shall not be binding on the parties," the second sentence of paragraph No. 2 erroneously adjudged that the committee's findings and recommendations "shall be" the basis for the narrowing or resolution of the matters in dispute. Section 13087.1 contemplates that those findings and recommendations *may be* the basis for the narrowing or resolution of such matters. Contrary to the Board's contention, however, the trial court did not err in

holding that the Winton Act requires the parties to meet and confer upon request "with respect to" the committee's findings and recommendations.

Section 13087.1 states that the procedure which it prescribes is one "for the resolution of persistent disagreements . . . ." Although the parties are not bound by the findings and recommendations of the committee, the committee's efforts would seldom be of aid in resolving persistent disagreements if the parties were under no statutory compulsion to meet and confer upon request with respect to such findings and recommendations.

Moreover, subdivision (e) of section 13081 defines "persistent disagreement" as "a disagreement between the parties to meeting and conferring required by this article that has not been resolved to the mutual satisfaction of the parties *through such meeting and conferring* within a reasonable period of time after the initial presentation of proposals . . . ." (Italics added.) It is clearly to be inferred, therefore, that matters which are subject to the "persistent disagreement" procedure of section 13087.1 are the same matters as to which section 13085 requires a public school employer to meet and confer upon request; hence findings and recommendations concerning such matters are likewise within the mandatory language of section 13085.

The judgment also held that "[t]he subject matter of the use and availability of specified school revenues and monies within the discretion of a public school employer to appropriate for an increase in teacher salaries," and "[t]he subject matter of the budget and spending priorities of a public school employer in relation to their substantial impact upon an increase in teacher salaries," are "matters relating to employment conditions" within the meaning of sections 13084 and 13085 and thus matters upon which section 13085 requires a public school employer to meet and confer upon request. The judgment permanently enjoined the Board from refusing to meet and confer upon the aforementioned fiscal matters "under reasonable and orderly procedures established pursuant to the Winton Act," provided that the revenues in question were substantial and not required to be otherwise expended by the existence of an emergency.

The Board asserts that the judgment erroneously brought the above stated fiscal matters within the scope of section 13085. The Board's argument fails. In our discussion of the San Juan case, we have explained that the Legislature intended certificated employees to have a broad scope of representation under sections 13080, 13084, and 13085.

The fiscal matters mentioned in the judgment not only all bear directly on teachers' salary increases (i.e., "wages" (§ 13084)) but also, to some extent, bespeak "the formulation of educational policy" (§ 13080); hence they are manifestly embraced by the inclusion in sections 13084 and 13085 of "all matters relating to employment conditions and employer-employee relations . . . ." The Board's disagreement with the plain meaning of those sections is a point of view which only the Legislature can vindicate by statutory repeal or amendment. This court has no such power.

Concerning such fiscal matters, of course, we interpret only the scope of the statutory obligation to "meet and confer" (§ 13085). As hereinbefore emphasized in the context of the San Juan case (*ante,* fn. 10 and pp. 242, 248, and 252), section 13088 expressly reserves to the Board the power of final decision.

 The injunctive portion of the judgment also enjoined the Board from "[e]xpending monies, not otherwise obligated or restricted and within its discretion to appropriate for teacher salaries and not required to be expended by the existence of an emergency, during such times as reasonable and orderly procedures, established pursuant to the Winton Act, are being pursued pursuant to a request to meet and confer upon the subject of the appropriation of such monies, if substantial, for an increase in teacher salaries." In apparent reference to this portion of the judgment, the Board contends that "[t]he Winton Act does not require that meeting and conferring be completed before a public school employer may act."

The Board's latter contention is overly broad. As indicated in that portion of this opinion devoted to the San Juan case, it cannot be said that the Winton Act requires, *without exception,* that meeting and conferring be completed before a public school employer may act. Those exceptions were preserved by the injunction in the instant (Yuba City) case, which restrained the Board from expending the subject monies only if there was no emergency need for them, and only if "reasonable and orderly" procedures were being pursued to implement a "meet and confer" request concerning their appropriation.

 The Board next contends that the trial court erred when, in paragraph No. 1 of the declaratory judgment, it held that "[t]ake-it-or-leave-it offers by a public school employer with respect to teacher salaries, a subject matter within the required scope of representation of the Winton Act, violates [*sic*] the Winton Act by failing the requirement of Education Code § 13081 [subd. (d)] that there be a conscientious effort

to reach agreement under orderly procedures." We uphold the Board's contention.

The judgment in this respect was based upon the court's finding (expressed as a conclusion of law) that the Board had made one or more "[t]ake-it-or-leave-it" offers with respect to teachers' salaries. The finding had substantial support in the undisputed evidence that on December 15, 1970, as its only counterproposal up to that time, the Board had made what the Board then called a "first, last and final offer." The finding was also supported by evidence that, with regard to the 1970-1971 salary adjustment, the Board had proposed two alternative methods of adjusting salaries while, at the same time, the Board was refusing the CEC's request to meet and confer concerning the report of the fact-finding committee.

The holding in paragraph No. 1, however, was too broad. *In and of itself,* the mere fact that offers made by a public school employer as to "meet and confer" items are "take-it-or-leave-it" offers is insufficient to show a lack of conscientious effort by the employer to reach agreement under orderly procedures. The Winton Act does not require the employer to initially overstate its demands and understate its concessions and make a series of proposals before arriving at an ultimate good faith position on an issue.

As said concerning an analogous proposition under the Labor Management Relations Act (29 U.S.C. § 141 et seq.), "The statutory duty to bargain collectively as set forth in Section 8(d) of the Act [29 U.S.C. § 158, subd. (d)] imposes upon the parties the obligation 'to meet * * * and confer in good faith with respect to wages, hours and other terms and conditions of employment' with a view to the final negotiation and execution of an agreement. The statute states specifically that this obligation 'does not compel either party to agree to a proposal or require the making of a concession.' [Cf., § 13088.] Thus the adamant insistence on a bargaining position is not necessarily a refusal to bargain in good faith. [Citation.] 'If the insistence is genuinely and sincerely held, if it is not mere window dressing, it may be maintained forever though it produce a stalemate. Deep conviction, firmly held and from which no withdrawal will be made, may be more than the traditional opening gambit of a labor controversy. It may be both the right of the citizen and essential to our economic legal system * * * of free collective bargaining.' [Citation.] The determination as to whether negotiations which have ended in stalemate were held in the spirit demanded by the statute is a question of fact which can only be answered by a consideration of all the 'subtle and elusive factors' that, viewed as a whole, create a true picture

of whether or not a negotiator has entered into discussion with a fair mind and a sincere purpose to find a basis of agreement. [Citations.]" (*N.L.R.B.* v. *Almeida Bus Lines, Inc.* (1st Cir. 1964) 333 F.2d 729, 731; see *Hodges* v. *Standard Accident Ins. Co.* (1961) 198 Cal.App.2d 564, 578 [18 Cal.Rptr. 17].)

 Lastly, the Board attacks the court's finding that the Board's policy was to refuse to meet and confer concerning the "substantial" impact of the District's budget priorities upon teachers' salaries, and the Board also challenges the finding that this policy was manifested in June 1972 by its conduct in response to a "meet and confer" request of the CEC. The Board's claim is that the evidence was insufficient to show that its refusal to meet and confer related to budget priorities having an impact upon teachers' salaries which was "substantial."

The claim is unavailing. The evidence was undisputed that, while refusing the CEC's ongoing requests to meet and confer on the effect of budget priorities upon teachers' salary increases, the Board used $74,000 from the District's undistributed reserve in August 1971 for purposes other than such increases. That sum is not insubstantial. The finding as to the Board's general policy in this regard being thus supported, there was a factual basis for the injunction and declaratory judgment in terms of that general policy. Thus any error in the specific finding as to the Board's conduct in June 1972 was harmless.

The judgments in 3 Civil No. 14010 and 3 Civil No. 13924 are modified in accordance with this opinion; and, as thus modified, the judgments are affirmed. The parties will bear their separate costs on appeal.

Regan, J., concurred.

**FRIEDMAN, Acting P. J.**—I concur in part, dissent in part. The Winton Act contains a number of large verbal abstractions which give the appearance but not the reality of concrete solutions. For example, after expressing a broad purpose "to afford [teacher organizations] a voice in the formulation of educational policy" (§ 13080), the act demands that school trustees meet and confer with these organizations "with regard to procedures relating to the definition of educational objectives, the determination of the content of courses and curricula, the selection of textbooks, and other aspects of the instructional program . . . ." (§ 13085.) Relatively narrow employee participation in *procedures* is hardly coextensive with broad participation in *policy*. Similar examples of linguistic looseness abound.

Statutory generalizations of this sort have the earmarks of verbal compromises between contending special interests. They allow a legislative escape from controversy and send the contending interests out into the administrative arena and from thence into already overburdened courts. Conventional tenets of statutory interpretation fall flat in the face of such draftsmanship. Hence, conflicting interpretations must be tentative and respectful.

The Winton Act seems to demarcate a number of separate functional areas, granting employee organizations a participatory interest in some, excluding them from others. The majority opinion, in my view, fails to observe these demarcations and indulges in a blending which extends employee participation into decisional concerns not intended by the Legislature.

An amicus brief filed by the California School Boards Association urges that the scope of representation granted employee organizations by Education Code sections 13083 and 13084 is not relevant in ascertaining the extent of the "meet and confer" provisions of section 13085. The majority opinion correctly rejects that contention. There is no sense in a labor relations statute which mandates a sphere of representation, then excludes the employee organization from any right to negotiate within part of that sphere.

In the case of San Juan Unified School District, I agree: (1) that the district's rules and regulations couldn't and didn't enlarge the statutory area of labor-management negotiations; (2) that the "master agreement" demanded by the San Juan Teachers Association was an unjustified attempt to impose an illegal collective bargaining contract on the school board; (3) that the school trustees had no optional authority to enter into collective bargaining contracts; (4) that the character of the school counselling program affected employment conditions of teachers, hence lay within the mandatory negotiation provision of section 13085; (5) that the school trustees could not refuse to "meet and confer" in an effort to define the scope of negotiations.

I dissent from the majority's approval of the declaratory judgment's statement that "all matters relating to the implementation" of the school counselling program were subject to compulsory negotiation. At this point the trial court simply repeated the fuzzy language of the statute. At this point the majority err by delineating too wide a scope for compulsory negotiations. For example, formulation of qualifications of

school counselors is a lawful subject of mandatory, teacher-management consultations; selection among individual counselling applicants is not. Thus the phrase "all matters" in the judgment is too broad to be sustained.

At one point the trial court granted a preliminary injunction which directed the school board to employ counselors with educational qualifications prescribed by the injunction. The injunction is outside the scope of this appeal. Nevertheless, I do not wish to imply approval by silence. Nothing in the law authorizes a superior court judge to fix the educational qualifications of applicants for school district employment.

As to the Yuba City Unified School District case, I agree generally with the majority opinion up to—but not including—its acceptance of the proposition that a school board must meet and confer with teacher organizations regarding budgetary allocations for educational purposes outside the area of teachers' salaries and fringe benefits. At this point, the trial court's judgment and the majority opinion rest upon this shaky thesis—that a decision to buy musical instruments or a school bus diminishes the money available to pay teachers, hence the school board is required to negotiate with the teachers' organization over the wisdom and necessity of purchasing musical instruments or a school bus. That thesis rests upon, first, an over-broad view of the employment conditions which section 13085 exposes to mandatory negotiation and, second, a refusal to recognize the 1970 amendment to section 13085.

When the Winton Act was adopted in 1965, section 13085 gave teacher organizations a right to negotiate with the school board in two areas. These were described in the following terms: (a) "all matters relating to employment conditions and employer-employee relations" and (b) "all matters relating to . . . the instructional program . . . ." In 1970 section 13085 was amended in several respects. (Stats. 1970, chs. 1412, 1413.) The 1970 amendment did not change the first of the above clauses, but the second was amended to substitute the word "procedures" for the phrase "all matters." Thus, as amended in 1970, the second of the above two clauses was amended to require negotiations covering "procedures relating to . . . the instructional program."

A school board makes up an annual budget of proposed expenditures and estimated revenues itemized "by functions and object." (Ed. Code, §§ 20602, 20603.) The budget may raise money for an "undistributed reserve" covering unforeseen expenditures. (Ed. Code, § 20605.) School

districts are limited by tax rate ceilings. (Ed. Code, §§ 20751, 20800.) Given a limited revenue, all expenditure decisions impinge upon one another. Every penny of anticipated revenue devoted to "functions and objects" other than employee compensation diminishes the revenue available for employee compensation. I find nothing in the Winton Act denoting a legislative design to inject employee organizations into the entire gamut of school board budgetary deliberations.

In relating the phrase "all matters relating to employment conditions" to budgetary determinations, it is difficult to articulate a formula for inclusion and exclusion. Generally, of course, this part of the statute embraces appropriations for salaries and fringe benefits. Dealing with a somewhat analogous statute, one court has restricted the scope of compulsory negotiations to those matters having "a significant or material relationship" to wages, hours and other conditions of employment. (*Westinghouse Electric Corporation* v. *N.L.R.B.*, 387 F.2d 542, 548; see also *Fibreboard Corp.* v. *Labor Board*, 379 U.S. 203, 223-224 [13 L.Ed.2d 233, 245-246, 85 S.Ct. 398, 6 A.L.R.3d 1130], separate opinion of Stewart, J.) In any event, when the relationship consists of nothing more than the negative effect created by distribution of revenue to other objectives, the decisions are outside the ambit of "matters relating to employment conditions."

The briefs fail to give precise outline to the clause of section 13085 requiring negotiations "with regard to procedures relating to . . . the instructional program." The failure is understandable, for the clause is murky and mystifying. Only one aspect of the matter has clarity—in deleting "all matters" at that point of the statute and substituting "procedures" as the area for compulsory negotiation, the 1970 Legislature distinctly expressed a desire to narrow that area. When the school board decides to spend money for musical instruments or a bus, the decision involves neither "employment conditions" nor "procedures relating to . . . the instructional program." I dissent from the majority view that section 13085 requires compulsory negotiations with teacher organizations in the general area of budget management.

The petitions of all the parties for a hearing by the Supreme Court were denied March 12, 1975. Richardson, J., did not participate therein.